RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0173p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 19-1906

DEMETRIUS EUGENE WOODSON,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:19-cr-00002-1—Paul Lewis Maloney, District Judge.

Decided and Filed: June 3, 2020

Before: GRIFFIN, THAPAR, and READLER, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Paul L. Nelson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand
Rapids, Michigan, for Appellant. Timothy VerHey, UNITED STATES ATTORNEY'S
OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

CHAD A. READLER, Circuit Judge. The target of Demetrius Woodson's interstate
diamond-stealing scheme, it seems, could only be Jared. Woodson and his accomplices stole
nearly $100,000 in diamonds from over a dozen Jared jewelry stores in six states. Following
Woodson's guilty plea to charges of conspiring to commit offenses against the United States, the
district court applied a two-level sentencing enhancement after finding that a central part of

Woodson's scheme was perpetual relocation to avoid law enforcement. *See* U.S.S.G. § 2B1.1(b)(10)(A). On appeal, Woodson argues that his practice of returning to his "home base" in Toledo means he never "relocated" the scheme, for Guidelines purposes. We reject his argument and **AFFIRM** the judgment of the district court.

## BACKGROUND

Over the course of four months, Woodson and his accomplices targeted fourteen Jared stores in Ohio, Indiana, Kentucky, Michigan, Illinois, and New Jersey. Their scheme was simple. The group would buy the same jewel clamps Jared stores used to display diamonds, placing relatively valueless cubic zirconia in them. Once inside a Jared store, Woodson would ask a clerk to see a diamond. An accomplice would then cause a disturbance, drawing the clerk's attention. With the clerk distracted, Woodson would replace the diamond with the cubic zirconia in the display case, leave the store with the diamond, and then fence the stolen item to a buyer in Toledo, Cleveland, or New York. All told, the group succeeded in stealing roughly $90,000 worth of diamonds.

The scheme finally came to an end when Woodson and his accomplices targeted multiple Jared stores in the Grand Rapids area on the same day. Diverting from their typical routine, Woodson and his accomplices instead pried open a Jared display case and stole four rings worth more than $7,000. A store clerk called 911. Officers broadcast descriptions of the men to law enforcement and jewelry stores. Later that day, Woodson was identified leaving another Jared store in a vehicle. When police stopped the vehicle, they found Woodson and his accomplices along with several pieces of diamond jewelry.

Woodson was indicted for conspiracy to commit offenses against the United States, in violation of 18 U.S.C. §§ 371, 2314, and 2315. The district court calculated Woodson's Guidelines range to be 21 to 27 months. Influential in that determination was the conclusion that Woodson "relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials." U.S.S.G. § 2B1.1(b)(10)(A). Woodson objected to the enhancement. Characterizing his Toledo residence as the scheme's "home base," he argued that the scheme had never "relocated" from Toledo. To buttress the point, he noted that

the conspiracy included thefts in Ohio, and that some stolen diamonds were sold to buyers in Toledo.  The district court disagreed.  Relying on our decision in *United States v. Hessa*, 464 F. App'x 473 (6th Cir. 2012), the court found that Woodson had purposely targeted stores near the Ohio, Indiana, and Michigan state lines and in other more distant jurisdictions to impede communication between law enforcement, triggering the relocation enhancement.  It then sentenced Woodson to 24 months' imprisonment.  Woodson appealed.

## ANALYSIS

In challenging his two-level relocation enhancement, Woodson makes a procedural reasonableness challenge to the computation of the Guidelines range.  *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).  When a district court improperly calculates the Guidelines range, the ensuing sentence is procedurally unreasonable.  *United States v. Bradley*, 897 F.3d 779, 784 (6th Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).  Woodson's challenge to the interpretation of the Guidelines raises a legal question we review de novo. *United States v. Susany*, 893 F.3d 364, 367 (6th Cir. 2018).

We begin, as always, with the text of the Guideline.  *See United States v. Havis*, 927 F.3d 382, 387 (6th Cir. 2019) (en banc) (per curiam) (holding that the "[t]he text of [a Guideline] controls" interpretation of its scope).  The Guideline provides for a two-level increase if the defendant "relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials."  U.S.S.G. § 2B1.1(b)(10)(A).  A straightforward reading of the text reveals four essential requirements: (1) relocation or participation in relocation, (2) of a fraudulent scheme, (3) to another jurisdiction, (4) to evade law enforcement or regulatory officials.

Woodson challenges the district court's interpretation of the first two requirements. Relying principally on two out-of-circuit opinions, Woodson argues that the relocation enhancement does not apply when conspirators further their criminal scheme in part from a fixed location, or "home base."  *United States v. Hines-Flagg*, 789 F.3d 751, 755–56 (7th Cir. 2015) (declining to apply the relocation enhancement where the defendants operated a criminal scheme

in part from a "home base"); *United States v. Morris*, 153 F. App'x 556, 557–58 (11th Cir. 2005) (per curiam) (same).

At the outset, we note that, as we explained in *United States v. Thornton*, a "relocation" can occur even when a criminal enterprise's physical headquarters (here, Toledo) has not changed. *See* 718 F. App'x 399, 403–05 (6th Cir. 2018). Thornton participated in a check fraud scheme that briefly targeted banks in one city before moving on to another, to avoid detection. *Id.* at 400. Recognizing the key role of relocation to Thornton's scheme, the district court imposed the § 2B1.1(b)(10)(A) enhancement. Thornton objected. Relying on the same out-of-circuit cases on which Woodson now relies, Thornton argued that § 2B1.1(b)(10)(A) in essence requires a change in the conspirators' permanent residences. *See id.* at 404 (citing *Hines-Flagg*, 789 F.3d at 755; *Morris*, 153 F. App'x at 557–58). And because Thornton and his co-conspirators each lived in and returned to Atlanta following their criminal sprees, the scheme, he argued, had not been relocated. *Id.*

Thornton's argument failed on two grounds. One, there was no evidence the defendants furthered the scheme while staying in Atlanta, meaning it was never a base of operations for the scheme. *Id.* at 404–05. Two, relying on dictionary definitions of the word "relocate," we observed that the term "does not require permanency or intent to remain in the new location," meaning that frequent movement of the scheme was not inconsistent with the § 2B1.1(b)(10)(A) enhancement. *Id.* at 404. We affirmed Thornton's sentence. *Id.* at 407.

Woodson's case, however, differs from Thornton's in one key aspect. Here, there is evidence that Woodson and his co-conspirators furthered their criminal scheme from Toledo—what Woodson describes as the conspirators' "home base"—by targeting stores, recruiting accomplices, and fencing stolen diamonds there. By all accounts, in other words, Toledo was more important to Woodson's scheme than Atlanta was to Thornton's. Unlike in *Thornton*, then, we must resolve whether the existence of a consistent "home base" from which defendants carry out key aspects of their criminal scheme precludes application of the relocation enhancement.

Back to the text of the Guideline. It requires relocation of "a fraudulent scheme." U.S.S.G. § 2B1.1(b)(10)(A). Woodson equates a "scheme" to a tangible object with a fixed

location (i.e., the hub of operations). But lexical sources defining "scheme" do not back up Woodson's interpretation. Those sources refer not to hideouts or tangible tools of the criminal trade but instead to intangible plans and concerted actions between co-conspirators. *Scheme*, Merriam-Webster ("[A] plan or program of action," especially "a crafty or secret one.), https://www.merriam-webster.com/dictionary/scheme (last visited June 2, 2020); *Scheme*, Dictionary.com ("[A] plan, design, or program of action to be followed; project . . . an underhand plot; intrigue."), https://www.dictionary.com/browse/scheme (last visited June 2, 2020); *Scheme*, Black's Law Dictionary (11th ed. 2019) ("A systemic plan; a connected or orderly arrangement, esp. of related concepts <legislative scheme>. . . . An artful plot or plan, usu. to deceive others <a scheme to defraud creditors>.").

Nor does Woodson's argument find support when viewed through the lens of corpus linguistics, which can also play a critical role in resolving interpretive questions. *See Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 439–40 (6th Cir. 2019) (Thapar, J., concurring in part and in the judgment) (explaining the value of corpus linguistics in interpreting legal texts); Thomas R. Lee & Stephen C. Mouristen, *Judging Ordinary Meaning*, 127 Yale L.J. 788, 828–30 (2018) (same). Consistent with the dictionary sources already discussed, the Corpus of Contemporary American English, which provides insight into how the word "scheme" is used in ordinary speech, offers no examples of the word "scheme" being used to refer to a tangible thing similar to a criminal hideout. *See Scheme*, Corpus of Contemporary American English, https://www.english-corpora.org/coca/ (last visited June 2, 2020). Instead, the term is consistently used to refer to concepts, plans, and, especially, criminal enterprises such as Ponzi schemes. *See id.* For purposes of § 2B1.1(b)(10)(A), then, a scheme is primarily the criminal agreement between co-conspirators rather than the physical headquarters from which the enterprise operates.

We therefore decline to adopt a categorical rule that the existence of a base of operations consistently utilized by conspirators to carry out portions of their scheme, such as recruiting accomplices or fencing stolen goods, precludes application of the § 2B1.1(b)(10)(A) enhancement. Rather, "where travel to other jurisdictions" to avoid detection by law enforcement is "a key component of a fraud scheme," the enhancement applies, regardless

whether the conspirators periodically return to a stationary hub to perform part of the scheme. *Thornton*, 718 F. App'x at 403–04.

Our holding is in accord with that of the First Circuit in *United States v. Savarese*, 686 F.3d 1, 15–16 (1st Cir. 2012). There, Savarese stole credit cards from lockers at Total Fitness facilities across the country. *Id.* at 5. Periodically, Savarese would compile and fax the stolen information back to his accomplices in Boston, who would then use the information to create fake IDs, which in turn were used along with the credit cards to obtain fraudulent cash advances. *Id.* at 5–6. The district court applied the relocation enhancement because moving from gym to gym to avoid detection was essential to Savarese's scheme, even if some of the scheme's core operations were carried out in a fixed location. *Id.* at 15–16. On appeal, Savarese argued that Boston was the scheme's effective hub, with the Total Fitness and cash advance locations serving merely as spokes. The First Circuit rejected the argument, finding that the roving parts of the fraud scheme were "at least as critical, if not more so, to the operation's success" as were the stationary parts. *Id.* at 15. The "transitory nature" of those core scheme activities "d[id] not undermine their centrality to the scheme." *Id.* Nor did "the fact that other tangential elements recurred in a convenient geographic locale." *Id.*; *see also United States v. Thung Van Huynh*, 884 F.3d 160, 167–69 (3d Cir. 2018) (imposing relocation enhancement despite defendant's argument that he always returned to California after his out-of-town trips to steal watches).

Our holding, we recognize, is at odds with the Seventh Circuit's decision in *Hines-Flagg*, the principal case upon which Woodson relies. 789 F.3d at 755–56. Hines-Flagg operated a scheme similar to Savarese's. She would manufacture fake IDs in her victims' names and then use those IDs to purchase items in stores in another jurisdiction. In distinguishing *Savarese*, the Seventh Circuit, over a dissent from Judge Flaum, emphasized the parts of the scheme that Hines-Flagg and her accomplices carried out from her home base in Detroit, playing down the fact that a key part of the scheme—purchasing the stolen goods—was deliberately carried out in another jurisdiction for the express purpose of evading detection. *Id.*; *see also Morris*, 153 F. App'x at 558 (declining to apply the relocation enhancement because "the [defendant's] out-of-town trips were meant to be temporary and that Defendant always returned to the Northern District of Georgia"); *but see Hines-Flagg*, 789 F.3d at 760 (Flaum, J., dissenting) (arguing that

the relocation enhancement should apply because "[e]ven if it fairly can be said that the home base of Hines-Flagg's scheme was in Detroit, the critical part of the scheme was the fraud itself. And it was that part that she relocated to different jurisdictions to evade authorities . . .").

But to our mind, "where travel to other jurisdictions" to avoid detection by law enforcement is "a key component of a fraud scheme," the § 2B1.1(b)(10)(A) enhancement applies. *Thornton*, 718 F. App'x at 403–04; *see also Hessa*, 464 F. App'x at 474–75. Even so, we note, where the defendants carry out part of their scheme from a static home base.

<p style="text-align:center">*     *     *     *     *</p>

With the legal standard clarified, Woodson's argument fails. Woodson and his co-conspirators frequently visited Jared stores in jurisdictions other than the Northern District of Ohio, often hundreds of miles away. And they did so to avoid detection. Indeed, their scheme seemingly would only work once in a given area, as the events leading up to Woodson's arrest demonstrate. That Woodson lived in Toledo and furthered the scheme there does not take away from the fact that the cubic zirconia ploy, performed on a roving basis, was the "heart of the enterprise." *Savarese*, 686 F.3d at 15. Relocating to different jurisdictions to avoid detection was thus an integral part of Woodson's criminal conduct, justifying the § 2B1.1(b)(10)(A) enhancement.

## CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.