RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0113p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee*,

 *v.*

CALVIN EARL MCREYNOLDS, JR.,

    *Defendant-Appellant*.

> No. 21-1521

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:16-cr-20677-15—Thomas L. Ludington, District Judge.

Argued: February 9, 2023

Decided and Filed: May 31, 2023

Before: CLAY, GRIFFIN and STRANCH, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Anna Schuver, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant. William J. Vailliencourt, Jr., UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Anna Schuver, Melissa M. Salinas, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant. Timothy M. Turkelson, UNITED STATES ATTORNEY'S OFFICE, Bay City, Michigan, for Appellee.

   CLAY, J., delivered the opinion of the court in which STRANCH, J., joined. GRIFFIN, J. (pp. 13–15), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.   For the second time, Defendant Calvin E. McReynolds Jr., appeals his sentence for his 2017 conviction for conspiring to distribute and to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.   In his first appeal, McReynolds argued that the district court erred in attributing to him a quantity of drugs substantially higher than the quantity of drugs that the jury attributed to him.   This Court vacated McReynolds' sentence and remanded the case for resentencing.   On remand, the district court attributed the same quantity of drugs to McReynolds as it had at the first sentencing.   McReynolds now appeals the district court's resentencing.   For the reasons that follow, we **VACATE** McReynolds' sentence and **REMAND** for resentencing in accordance with this opinion.

## I.  BACKGROUND

In April 2017, a grand jury indicted McReynolds with conspiracy to distribute and to possess with intent to distribute heroin and cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846.   McReynolds was indicted alongside seventeen co-defendants, all of whom pled guilty.   McReynolds pled not guilty and proceeded to trial.   At trial, the government, using circumstantial evidence, argued that McReynolds was part of the charged conspiracy, and thus should be held responsible for the drug quantities attributed to the conspiracy.   McReynolds denied his involvement in the charged conspiracy, arguing that he was a drug dealer who only sold drugs for individual consumption.   The jury found McReynolds guilty of the charged offense and attributed "less than 100 grams" of heroin and "less than 500 grams" of cocaine to him.   (Jury Verdict, R. 478, Page ID #2534–35).   The jury's verdict did not include the drug amount attributed to the entire scope of the conspiracy.   After the trial, the Probation Office prepared a Presentence Investigation Report ("PSR") that included the drug amounts attributable to the conspiracy in its calculation of the drug quantity attributable to McReynolds—in total, it attributed 767.66 grams of heroin, 711.56 grams of cocaine, and 263.51 grams of cocaine base to McReynolds.

Notwithstanding the jury's verdict, the district court adopted the PSR's drug quantity calculation and resulting offense level calculation when calculating McReynolds' sentence. The PSR calculation increased the low end of McReynolds' advisory guidelines range by approximately five years, as his base offense level based on the jury's determination is 24 (63 to 78 months) and his base offence level based on the PSR's determination is 30 (121 to 151 months). Combining his base offense level, criminal history, and a two-level firearm enhancement, McReynolds' guidelines range was calculated to be 151 to 181 months of imprisonment. The district court imposed a within-guidelines sentence of 151 months of imprisonment and six years of supervised release.

McReynolds timely appealed his conviction and sentence. We affirmed McReynolds' conviction but vacated his sentence and remanded "with instructions that the district court should adequately explain its reasoning if it attributes any drug amounts to McReynolds beyond the jury's verdict when calculating his base offense level." *United States v. McReynolds*, 964 F.3d 555, 566 (6th Cir. 2020). We reasoned that the district court was "authorized to disregard the jury's conclusions regarding the drug amounts and to attribute higher drug amounts to McReynolds at sentencing only insofar as those amounts were supported by a preponderance of the evidence." *Id.* at 565. Because "the district court did not explain why it found those higher drug amounts supported by preponderant evidence in the present case," the sentence was remanded. *Id.*

On remand, the district court did not change its guideline range determination of 151–181 months, but it imposed a below guideline sentence of 145 months to account for McReynolds' post-sentencing positive conduct. Further, in accordance with this Court's opinion, the district court provided additional explanation of its sentencing decision. The district court concluded that the PSR correctly calculated the drug quantity attributable to McReynolds because that quantity was within the scope of his conspiratorial agreement and foreseeable to him. To explain its deviation from the drug quantity that the jury attributed to McReynolds, the court opined that the jury was "confused." In support of its own drug quantity determination, the district court pointed to three key witness testimonies. Those witnesses were: Mitchell King, a special agent

who investigated this case; Brandon Pratt, charged as a co-conspirator in this case; and Araceli Acosta, one of McReynolds' former customers.

We briefly review the witness testimony on which the district court relied, and turn first to Mitchell King's witness testimony. Based on intercepted communications obtained through court-authorized wiretaps, King testified that McReynolds purchased a half ounce of cocaine from the lead actor of the conspiracy "about every four days," and asked to share weight scales at least once.[1] (Trial Tr., R. 570, Page ID # 3878–79, 3884). King also testified that Damarlin Beavers, the conspiracy's supplier, warned McReynolds of potential law enforcement in the area. Further, King testified that a remote pole camera[2] identified Defendant outside of one of the houses commonly used by and associated with members of this conspiracy. However, King also testified that no documentation or physical evidence linked McReynolds to the lead conspirators. Moreover, King testified that even though eight warrants were executed during the investigation, and McReynolds was identified on intercepted communications, no warrant was executed to search McReynolds' residence.

We next turn to Brandon Pratt's testimony. Based on the intercepted calls that the government played for Pratt, Pratt testified that he believed McReynolds was involved in various joint undertakings, including participating in conversations setting drug prices to divert business from other dealers "probably a couple times," (Trial Tr., R. 571, Page ID #4000–02), and once sharing a scale with Beavers. The government also played for Pratt a conversation between Beavers and McReynolds in which Pratt suggested that the two were talking about "cutting" (diluting) the drugs. Pratt also confirmed, based on an intercepted call played for him at trial, that Beavers had warned McReynolds of law enforcement in the area. Pratt further testified that McReynolds frequently associated with other conspirators, including Kendrell Stephens. According to Pratt, McReynolds and Stephens would share customers as well. With respect to one of the identified stash houses, Pratt did not know whether McReynolds ever used the house

---

[1]King testified that scales were used among the conspirators in this case to accurately calculate the quantity of controlled substances before sale.

[2]King testified that a pole camera is a video recording device, with no audio, that is placed on a pole and used to monitor an area remotely, allowing law enforcement to identify individuals and record license plate numbers.

to store drugs but testified that he had seen him there "probably once or twice." (*Id.* at Page ID #4014, 4017). However, despite the alleged connections to the co-conspirators, Pratt testified that "[McReynolds] like[d] to do his own thing," and after 2013 Pratt did not engage in any drug related conduct with McReynolds. (*Id.* at Page ID # 3994–95).

Finally, we turn to Araceli Acosta's testimony. Acosta testified that between 2014 and August 2016, she bought heroin and crack cocaine from McReynolds "two or three times a day," totaling about 0.3 grams of each per day. (Trial Tr., R. 559, Page ID #3503–05). Acosta also testified that she had seen McReynolds and Stephens together at an apartment known as "the kitchen." As Acosta recalled, she came to "the kitchen" looking to buy heroin from McReynolds. Based on Acosta's testimony, it is unclear whether McReynolds was already in the kitchen when Acosta arrived, but Acosta waited at the house and saw Stephens walk in carrying "bricks" of purported cocaine and heroin in a duffel bag. Stephens then apparently said, "Remember, she's not supposed to be here." (*Id.* at Page ID #3516). Acosta testified that she left the house to wait outside, and McReynolds stepped out and sold her heroin. Acosta also recalled another instance where she met McReynolds at the "kitchen." She testified that McReynolds was there with Stephens and that the two were packaging heroin for retail distribution. (*Id.* at Page ID #3517–18). Acosta's testimony does not establish that McReynolds and Stephens shared any controlled substances or related materials, nor did she state that McReynolds stored any of his supply in the "kitchen."[3] Acosta's testimony was limited to observing McReynolds interacting with Stephens in the "kitchen" while she waited for her delivery of requested narcotics.

McReynolds timely appealed the district court's resentencing determination. McReynolds argues that the district court erred in attributing the conspiracy-wide drug quantities to him, as the evidence used to justify the amount was circumstantial, and only establishes that McReynolds "was a low-level dealer who purchased drugs in small quantities from Damarlin Beavers, the conspiracy's supplier, to sell to individual users for consumption." (Pet'r's Br.,

---

[3]The court below found Acosta's testimony that McReynolds was involved with dividing the bricks to be credible but found the evidence as to the composition and weight of the bricks to be conjecture. Thus, the district court did not attribute the "bricks" observed by Acosta to McReynolds' sentencing calculation.

ECF No. 16, 5).  McReynolds requests that "this Court [] remand with instruction that the drug quantity calculation made at sentencing be limited to the jury's affirmative finding on the specific quantity attributable to McReynolds." (*Id.* at 7).  Further, McReynolds requests that the district court adopt the jury's findings of a "lower drug quantity" resulting in "a base offense level of 24." (*Id.* at, 36, n.3).  He also requests that this Court reassign the case to a new district judge on remand.

## II.  DISCUSSION

### A.  Standard of Review

We review the district court's factual determination of the quantity of drugs involved in an offense for clear error.  *United States v. Russell*, 595 F.3d 633, 646 (6th Cir. 2010).  We also review "a district court's decision concerning a defendant's role in an offense" for clear error.  *United States v. Gates*, 461 F.3d 703, 709 (6th Cir. 2006).  "A court's approximation of the amount of drugs involved in a particular case is not clearly erroneous if supported by 'competent evidence in the record.'"  *United States v. Mahaffey*, 53 F.3d 128, 132 (6th Cir. 1995) (quoting *United States v. Brannon*, 7 F.3d 516, 520 (6th Cir. 1993)).  "The district court can make a reasonable estimate [as to the drug quantity] based on physical evidence or testimony."  *United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020).  Then "the drug quantity assigned to a defendant [must be] supported by a preponderance of the evidence."  *United States v. Gardner*, 32 F.4th 504, 525 (6th Cir. 2022).  "The government has the burden of proving by a preponderance of the evidence the amount of drugs for which a defendant is accountable."  *Id.* at 131.

### B.  Analysis

#### 1.  Lack of Supporting Evidence

On appeal, we are presented with the question of whether competent evidence in the record supports the district court's drug quantity determination.  We hold that it does not.  The district court's attribution of conspiracy-wide drug quantity to McReynolds was clearly erroneous because the record only presents circumstantial evidence establishing that

McReynolds had knowledge of the conspiracy—it does not establish he was a participant in the conspiracy.[4]

"[I]n order to hold a defendant accountable for the acts of others [under § 1B1.3(a)(1)(B)], a district court must make two particularized findings: (1) that the acts were within the scope of the defendant's agreement; and (2) that they were foreseeable to the defendant." *United States v. Campbell*, 279 F.3d 392, 399–400 (6th Cir. 2002) (quoting *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995)); *accord, e.g.*, *United States v. Merriweather*, 728 F. App'x 498, 520–22 (6th Cir. 2018). These contours "provide[] adequate protection against the possibility that a less culpable, 'small-time' seller of drugs will be caught up in the sweep of [21 U.S.C. § 841] due to the acts of coconspirators." *United States v. Pruitt*, 156 F.3d 638, 645 (6th Cir. 1998). At issue is the scope of the conspirator's agreement with McReynolds. To determine the scope of jointly undertaken criminal activity, we consider six factors: "(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme." *United States v. Donadeo*, 910 F.3d 886, 895–96 (6th Cir. 2018) (quoting *United States v. Salem*, 657 F.3d 560, 565 (7th Cir. 2011)).

The district court found that:

> the evidence at trial [] indicated that Defendant collaborated with Kendrell Stephens, sold and packaged drugs in the "the kitchen," visited the Grant Street stash house with other conspirators, and was otherwise informed of and participated in the full scope of the criminal enterprise. There was even testimony that other conspirators would warn Defendant when police were patrolling near where he dealt drugs.

(Sentencing Order., R. 776, Page ID # 6322). Those findings constitute an exaggerated interpretation of the record.

---

[4]McReynolds argues that the district court erred in relying on the PSR because the PSR used an incorrect legal standard for relevant conduct at sentencing. However, the PSR purports to provide the factual background of the case and information pertaining to the defendant's personal characteristics and criminal history. The district court is tasked with conducting the legal analysis based on the facts in the record. In this case, the district court applied the correct legal standard for relevant conduct, pertaining to, (1) the scope of the conspiracy and (2) foreseeability, but we find that the district court erred in its application of the legal standard to the facts.

None of the six factors point to a conspiratorial agreement involving McReynolds. As to the existence of a single scheme, the district court has failed to establish that McReynolds was an actor in the single conspiratorial scheme in this case. The record simply established that McReynolds bought small quantities of drugs from Beavers and sold them to customers for individual consumption.

The government argues that "McReynolds and his co-conspirators coordinated with each other to sell kilograms of cocaine and heroin throughout Saginaw." (Resp't's Br., ECF No. 21, 18). This is not supported by the record. The purposes for which McReynolds communicated with Beavers included: to obtain a supply of controlled substances, to alert one another of police activity, and to share a scale *once*. These instances of communication do not establish a common goal of criminal activity. The sharing of a scale *once* and warning of police activity in the neighborhood is not sufficient to establish a single scheme. *Cf. United States v. Love*, 392 F. App'x 410, 417–18 (6th Cir. 2010) ("Love did not merely purchase cocaine from other members of the conspiracy for distribution, but he also recruited others and provided logistical support; his criminal responsibility therefore extended well beyond the quantities of cocaine that he himself handled.").

Moreover, the government did not establish modus operandi, coordination of activities among schemers, or a pooling of resources or profits. The only common thread established by the government is that Beaver supplied controlled substances. *See* U.S.S.G. § 1B1.3, cmt. n.4(C)(vi) (distinguishing for purposes of sentencing street-level drug dealers who share a common source of supply but otherwise operate independently, from street-level dealers who pool resources and profits). The record does not establish that McReynolds coordinated his drug sales with the other conspiracy members or performed a specific service for the conspiracy. The conjecture that McReynolds may have been present in one or two meetings regarding pricing over the course of fourteen months, had been seen with co-conspirators, or appeared in the stash house on two occasions, is not sufficient to establish that McReynolds was a co-conspirator. Further, Pratt testified that he did not know whether Defendant ever used the house to store drugs. (Trial Tr., R. 571, PageID #4014, 4017). And Acosta's testimony did not establish that any controlled substances or materials related to the controlled substances were shared between

McReynolds and Stephens, nor did she state that McReynolds stored any of his supply in "the kitchen." At most, the record established that McReynolds had knowledge of the scope of the conspiracy, but not that he had an agreement as to the scope of the overall operation.[5] *See United States v. Cowley*, 800 F. App'x 402, 404 (6th Cir. 2020) (attributing the conspiracy-wide quantity where "evidence showed that higher-ups in the conspiracy would ask [for defendant's] help with critical tasks, such as picking up packages, alerting other co-conspirators when packages had arrived, and 'breaking down' shipments of crystal meth into saleable portions."). As to the last factor, the length and degree of the defendant's participation in the scheme, McReynolds bought drugs from Beavers during the relevant time frame, but the scope of his narrow agreement with Beavers did not vary during that time. The evidence only establishes that McReynolds occasionally associated with the conspirators and used Beavers as a supplier for his own drug sales. The district court failed to establish, with competent evidence from the record, that the scope of McReynolds' agreement went beyond an individual agreement with Beavers.

Moreover, we note a significant absence of evidence linking McReynolds to the conspiracy. Law enforcement's fourteen-month investigation produced *no* physical evidence connecting McReynolds to the conspiracy-wide drug quantity, and none of the eight search warrants that law enforcement executed at the conspiracy's stash houses and conspiracy leaders' homes yielded *any* evidence against McReynolds. The searches did not uncover any drug ledgers, fingerprints, personal items, documentation, or any other physical evidence linking McReynolds to the conspiracy. Throughout the course of its investigation, law enforcement

---

[5]The dissent concludes that "McReynolds was an active participant in cutting drugs used by the entire conspiracy." It bases its conclusion on an inaccurate reading of the record. The dissent states that Pratt linked McReynolds to the "cutting" process based on Pratt's interpretation of *one* phone call between Beavers and McReynolds, where Beavers asked whether McReynolds had gone to a hardware store; Pratt testified that "cut" was typically bought at hardware stores. (*See* Trial Tr., R. 571, Page ID # 4005–06). According to Pratt's interpretation of the call, McReynolds told Beavers that Stephens "got it." (*See id.*). The dissent's conclusion that this phone call establishes enough to implicate McReynolds as an active participant in "cutting" drugs for the conspiracy is misguided. The district court acknowledged that Stephens, not McReynolds, "was generally in charge of 'cutting' the group's heroin for distribution." (Sentencing Order, R. 776, Page ID # 6313). Pratt's testimony merely demonstrates that McReynolds had knowledge of Stephens' role in diluting the conspiracy's drugs, not that he himself took part in the process. The dissent also points to Pratt's interpretation of a phone call between Stephens and Beavers regarding "[g]etting cut for the heroin," and an individual on the call stated that "he got some cut from Detroit." (*See* Trial Tr., R. 571, Page ID # 4006). The dissent incorrectly characterizes the phrase "he got some cut from Detroit" as vague. Pratt is interpreting a phone call between *Stephens* and *Beavers*, and Pratt's use of "he" is in reference to one of the individuals on the call. (*See id.*). The dissent errs in finding that the "he" could refer to McReynolds. (*See id.*). Therefore, the dissent misrepresents the evidence in this case in reaching its conclusion.

chose not to search McReynolds' home or wiretap his phone. The evidence presented only establishes that, as previously noted in the Court's prior opinion, "McReynolds was a dealer, who was 'merely purchas[ing] cocaine from other members of the conspiracy for distribution,' which he would then sell in half-ounce portions for personal consumption." *McReynolds*, 964 F.3d at 565 (quoting *United States v. Love*, 392 F. App'x 410, 417 (6th Cir. 2010)). Because the higher drug quantities were not supported by a preponderance of the evidence, McReynolds' sentence is substantively unreasonable.[6,7]

> 2. Jury Determination of the Drug Quantity Attributable to McReynolds

Having determined that the district court clearly erred in attributing the conspiracy-wide drug quantity to McReynolds because competent evidence did not support that determination, we need not proceed further. However, we will address the district court's reliance on the jury's alleged "confusion" to explain its deviation from the jury-found drug quantity attributable to McReynolds.

The district court based its opinion on the length and difficulty of the jury instructions. Given this purported confusion, the court "believed there was good reason to reconsider the jury's determination, to independently evaluate the evidence, and to decide whether the preponderance of the evidence supported the attribution provided in the PSR." (Sentencing Order, R. 776, Page ID #6326)

---

[6]McReynolds argues that the government misstated McReynolds' criminal history level as VI at his resentencing hearing, which could have prejudiced the district court's analysis. (Pet'r's Br., ECF No. 16, 35). Moreover, the district court incorrectly stated that McReynolds "scored six criminal history points with two convictions." (*See* Sentencing Order, R. 776, Page ID #6316). However, McReynolds does not provide analysis as to how these errors impacted his sentence. Given McReynolds contention that the PSR correctly applied a criminal history level III to McReynolds, and the district court adopted the PSR's recommendation, the district court's misstatement in its sentencing opinion is harmless error.

[7]The dissent ignores the preponderance of evidence standard in its analysis. It instead assesses whether the district court's interpretation of the record was reasonable; however, the district court is also tasked with determining that its sentencing determination is supported by a preponderance of evidence. *See Gardner*, 32 F.4th at 525. The dissent is correct in stating that district court may deviate away from jury-found facts in its sentencing, including "acquitted conduct." *See United States v. White*, 551 F.3d 381, 382 (6th Cir. 2008). However, as we have stated in our prior opinion in this case, if a judge deviates from jury-found facts, the basis for the deviation must be supported by a preponderance of evidence. *United States v. McReynolds*, 964 F.3d 555, 565–66 (6th Cir. 2020). In our analysis, we simply apply the well-settled standard that when a district court applies judge-found facts to a sentencing determination, the district court's conclusions must be supported by a preponderance of evidence.

However, the district court provided the jury instructions to seek a drug quantity determination based on the government's recommendation acting on internal guidance from Department of Justice, which the district court found to be "reasonable, especially given this Court's experience with advisory jury findings." (*Id.*, Page ID # 6325). "Accordingly, the jury was tasked with finding the specific type and amount of controlled substances 'that was either attributable to the defendant as a result of his own conduct, or the conduct of other conspirators reasonably foreseeable to him.'" (*Id.* (quoting Verdict Form, R. 478, Page ID # 2534)).

The district court simply concludes that "whether the conduct of any conspirators was 'reasonably foreseeable' proved to be a problematic inquiry." (*Id.*, Page ID # 6325). However, the district court's description of the jury's purported confusion in its sentencing opinion is general, speculative and fails "to overcome the presumption that the jury was capable of [resolving the dispute] or to outweigh society's interest in a single, efficient trial." *United States v. Allen*, 16 F.3d 1221, at *1 (6th Cir. 1994) (table). Indeed, the jury posed questions during its deliberation about drug attribution and pointed to a mistake in an exhibit provided by the government, which was subsequently corrected. In response, the court received the jury's concerns and provided corrections and responses when necessary.

If the district court was concerned with the jury's understanding of the case, it could have ameliorated the confusion through special instructions or cautionary warnings. The district court did not take any action beyond responding to the jury's questions, thus demonstrating its confidence in the jury's ability to understand the instructions set forth to them. Accordingly, the record does not support the district court's statement at sentencing that the jury was confused in reaching its determination. Instead, it appears that the district court was simply dissatisfied with the outcome.[8]

---

[8]Because we hold that competent evidence does not support the district court's deviation from the jury-found drug quantity attributable to McReynolds and vacate and remand McReynolds' sentence on that basis, we need not decide whether a district court may make findings that contradict a jury's affirmative findings. In *United States v. White*, 551 F.3d 381 (6th Cir. 2008), this Court authorized a district court to sentence the defendant based on conduct established by a preponderance of the evidence, even though the jury found that the defendant's conduct was not proven beyond a reasonable doubt. By contrast, in this case, an affirmative jury verdict found, beyond a reasonable doubt, the specific drug quantity attributable to McReynolds. Allowing a district judge to use facts and conduct in its sentencing determination that contradict affirmative determinations made by the jury, risks the creation of "a shadow criminal code under which, for certain suspected offenses, a defendant receives few of the

3.  Reassignment

Finally, we address McReynolds' request that the Court assign the case to a new district judge.  McReynolds requests that this Court "remand this case to a new judge in light of the unusual, years-long back-and-forth between this Court" and the district court.  (Pet'r's Br., ECF No. 16, 35).  As this Court has explained, "reassignments should be made infrequently and with the greatest of reluctance."  *Sagan v. United States*, 342 F.3d 493, 501 (6th Cir. 2003) (quoting *Armco, Inc. v. United Steelworkers of Am., AFL-CIO, Local* 169, 280 F.3d 669, 683 (6th Cir. 2002)).  In considering whether reassignment is necessary, the Court considers three factors: "(1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness."  *Solomon v. United States*, 467 F.3d 928, 935 (6th Cir. 2006).  In this case, none of the factors favor reassignment.  While the Court finds that the district court's handling of McReynolds' sentencing was not correct, it does not find that it was based on any improper conceptions regarding the merits of McReynolds' claims.  Nor is there any indication of bias or prejudice on behalf of the district judge.  The Court therefore finds there is benefit in remanding this case to the same district judge that has a thorough understanding of the facts present in this case.

## III.  CONCLUSION

For the reasons set forth above, we **VACATE** McReynolds' sentence and **REMAND** for resentencing, with instructions that the district court implement the jury's verdict setting forth the jury-found facts.

---

trial protections mandated by the Constitution."  *United States v. Grier*, 475 F.3d 556, 574 (3d Cir. 2007) (Ambro, J., concurring).  However, this Court need not make this determination to resolve this case.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

GRIFFIN, Circuit Judge, concurring in part and dissenting in part.

I join that portion of the majority opinion that denies McReynolds's request for reassignment to a different judge, with the exception of the statement that "the district court's handling of McReynolds's sentencing was not correct." However, because the district court did not clearly err when it calculated the drug weight attributable to Calvin McReynolds and sentenced him accordingly, I would also affirm his sentence. I therefore concur in part and dissent in part.

In my view, our clear-error standard of review is dispositive regarding this sentencing appeal. Under this rigorous and deferential review standard, we must affirm the district court's factual determinations regarding drug weight (and, correspondingly, the scope of McReynolds's conspiratorial agreement) absent a clearly erroneous ruling. *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018). A "finding of fact is not clearly erroneous simply because there is evidence in the record that might support a different finding." *United States v. Vance*, 956 F.3d 846, 853 (6th Cir. 2020) (citation omitted). Rather, it is clearly erroneous only if we are "left with the definite and firm conviction that a mistake has been committed." *Donadeo*, 910 F.3d at 893 (citation omitted). This review is extremely deferential: we must affirm the district court "even if we would have made the opposite finding, so long as both stories are plausible on the record as a whole." *United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022) (internal quotation marks and brackets omitted). Furthermore, the district court was permitted to draw reasonable inferences from the record when fashioning McReynolds's sentence. *See United States v. Parrish*, 915 F.3d 1043, 1048 (6th Cir. 2019); *see also United States v. Gardner*, 32 F.4th 504, 525 (6th Cir. 2022) ("[A] drug-quantity determination doesn't require explicit statements from a defendant. Instead, a district court need make only a reasonable estimate based on the record." (internal quotation marks omitted)). Here, the record and the reasonable inferences that can be drawn from it fall comfortably within the deference we accord the sentencing court.

Recall first that Araceli Acosta testified that she saw McReynolds twice at "the kitchen," a location conspirators used to prepare their drugs. On one of those occasions, Kendrell Stephens brought large quantities of cocaine and heroin and told Acosta to leave before McReynolds distributed a smaller amount of heroin to her outside. Before she left, though, she saw McReynolds and Stephens processing and packaging drugs for sale. This testimony directly supports the district court's conclusion that McReynolds had a larger role in the conspiracy than the street-level dealer he claims to be.

Several reasonable inferences also support this conclusion. First, Damarlin Beavers, the conspiracy's supplier, asked McReynolds if he had a scale, from which the district court could reasonably infer the two were pooling resources. Second, Beavers also called McReynolds to warn him about police presence. It is reasonable to infer that Beavers was protecting a peer (that is, a high-level participant) in the conspiracy. Third, Brandon Pratt testified that McReynolds participated in price-setting conversations, bolstering the reasonable inference that McReynolds helped manage the conspiracy. Finally, although Stephens was "generally" in charge of cutting (diluting) the drugs, Pratt linked McReynolds to that process—testifying that Beavers asked McReynolds if he had gone to a hardware store and bought cutting agents, to which McReynolds replied "yeah, [Stephens]'s got it." Although Pratt testified that "*he* got some cut from Detroit" without clarifying whether "he" was McReynolds, Beavers, or Stephens, it was reasonable for the district court to infer, based on this ambiguous testimony and other record evidence tying McReynolds to the conspiracy's distribution activities, that McReynolds was an active participant in cutting drugs used by the entire conspiracy.

Each of these reasonable inferences supports the district court's factual finding that McReynolds agreed to all the conspiracy's dealings. But rather than accepting these reasonable inferences, the majority makes *different* factual findings—all in McReynolds's favor. It outright rejects the testimony about sharing a scale and warning of police activity, characterizes the testimony about McReynolds's participation in price-fixing conversations as "conjecture," and assumes that none of the drugs in the "kitchen" were McReynolds's. Yet the clear-error standard turns not on the inferences *we* would draw after review of the cold record, but on the reasonableness of the inferences made by the district court. Absent unreasonableness, it is not

our place to disturb the district court's findings of fact.  *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008); *see also Estrada-Gonzalez*, 32 F.4th at 614.

Finally, I respectfully dissent from the extraordinary and unprecedented directive on remand for "the district court [to] implement the jury's verdict setting forth the jury-found facts." Our precedent allows district courts to consider acquitted conduct at sentencing.  *See United States v. White*, 551 F.3d 381, 382 (6th Cir. 2008) (en banc); *see also United States v. Watts*, 519 U.S. 148, 154 (1997).  Today's remand order directly conflicts with that precedent.  In particular, were the district court's drug-weight calculation to be clearly erroneous, the appropriate remedy would be to vacate the sentence and remand for resentencing following the district court's renewed fact-finding regarding the drug weight attributable to McReynolds.  *See, e.g.*, *United States v. Campbell*, 279 F.3d 392, 399, 401 (6th Cir. 2002).  In my view, the majority's directive that the district court adopt the jury-found facts is contrary to law.

The district court concluded that a single scheme existed:  one that McReynolds knew of and participated in by coordinating activities and pooling resources with his co-defendants.  *See Donadeo*, 910 F.3d at 895–96.  It was then authorized to sentence McReynolds using the conspiracy-wide drug amount, even if that amount was larger than the weight attributed to McReynolds by the jury.  *See Watts*, 519 U.S. at 154; *White*, 551 F.3d at 382.  On this record, I am not "left with the definite and firm conviction that a mistake has been committed." *Donadeo*, 910 F.3d at 893 (citation omitted).

For these reasons, I would affirm the sentence imposed by the district court.