RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0083p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TAYSEER YOUSEF,

*Defendant-Appellant.*

No. 25-1426

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:23-cr-00086-1—Hala Y. Jarbou, District Judge.

Decided and Filed: March 17, 2026

Before: BOGGS, NALBANDIAN, and MATHIS, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Frank Stanley, FRANK STANLEY, P.C., Grand Rapids, Michigan, for Appellant. Alexia A. Jansen, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

MATHIS, Circuit Judge. Tayseer Yousef was a professional "fence" in a scheme to resell stolen cell phones obtained from armed robberies of retail stores. A jury convicted Yousef of two counts of interstate transportation of stolen goods and one count of conspiracy to transport stolen goods interstate. The district court sentenced him to 109 months' imprisonment. On appeal, Yousef challenges the procedural reasonableness of his sentence. We affirm.

**I.**

Tayseer Yousef owned a cell-phone store outside Chicago, Illinois. From at least 2020 to 2021, he regularly purchased stolen cell phones from robbery crews based in Grand Rapids, Michigan, to sell domestically and overseas at a substantial profit. Operating mostly in west Michigan, the robbers would enter AT&T, T-Mobile, and other retail stores during business hours, displaying weapons and threatening store employees. Some employees suffered injuries, with one store clerk reporting "a broken jaw and a broken nose." R. 92, PageID 644. On at least one occasion, a robber stole an employee's personal cell phone.

Although Yousef was not present at any of the robberies, he encouraged the robberies and sometimes even helped direct them. When inventory ran low, Yousef texted his coconspirators urging them "to get [him] more stuff." R. 110, PageID 1216. On many occasions, he provided specific instructions to thieves on what devices to steal and which retail chains to target. Yousef also provided guidance on how to evade law enforcement; for example, he advised the robbers to avoid older phone models because they are easier for authorities to track.

After a robbery, the thieves would typically message Yousef through a middleman, describe what they had to sell, and arrange for a meeting. Yousef would then drive from Chicago to Michigan to purchase the phones, either directly from the robbers or through an intermediary. Yousef and the robbers would often complete the entire transaction on the same day as the robbery.

Yousef sold many of the stolen phones in his store. To prepare the phones for resale, he had to circumvent various security precautions designed to prevent the use of stolen phones. For example, when a phone is stolen, a carrier will "blacklist" the phone, so that it cannot be activated or used on a cellular network in the United States, Canada, or Great Britain. R. 94, PageID 1012. But Yousef claimed he was able to "clean" a stolen phone by removing its identifying information. R. 110, PageID 1210.

Yousef would also sell phones in overseas markets like Dubai and Hong Kong. In those markets, blacklisting had no effect. And so the phones could be worth two or three times more when sold to international buyers.

In 2020, law enforcement began investigating a string of cell-phone-store robberies in and around Grand Rapids. Investigators learned that multiple robbery crews sold stolen electronic devices to the same individual, later identified as Yousef. After obtaining a search warrant for Yousef's Apple iCloud accounts, investigators discovered photos, messages, and other evidence tying him to a conspiracy, involving multiple robbery crews, to obtain and resell stolen cell phones and other electronic devices. In all, the government linked Yousef to 42 robberies between 2018 and 2021, involving stolen merchandise with a combined value of $1,045,441.93.

A grand jury indicted Yousef on three counts: one count of conspiracy to transport stolen goods interstate, 18 U.S.C. §§ 371, 2314; and two counts of interstate transportation of stolen goods, *id.* § 2314. Yousef was charged in connection with two robberies: a November 15, 2020 robbery of an AT&T store and a January 20, 2021 robbery of a T-Mobile store.

Yousef exercised his right to a jury trial. At trial, the government presented cellular location data and license-plate toll records revealing that Yousef traveled to Michigan shortly after at least nine robberies, including the two subject robberies. The government also introduced text messages connecting Yousef to dozens of other robberies. These messages included price lists, handoff logistics, and other instructions to the robbers. And the evidence left little doubt that Yousef knew all about the robberies—including how dangerous they were. In one message, Yousef shared a link to a news article about "a string of violent robberies at several cell phone stores" in west Michigan.[1] He informed another individual of a cell-phone-store robbery set to occur the following morning. The jury convicted Yousef on all three counts.

At sentencing, the district court applied numerous sentencing enhancements. Relevant here are three enhancements based on the conduct of Yousef's coconspirators: theft from the

---

[1]*See* Sam Knef, *West Michigan police look for suspects involved in string of cell phone store robberies*, WWMT (Nov. 5, 2020), https://perma.cc/3MLU-Z5YR.

person of another, U.S.S.G. § 2B1.1(b)(3); possession of a dangerous weapon, *id.* § 2B1.1(b)(16)(B); and physical restraint of a victim, *id.* § 3A1.3. Also at issue is an enhancement for using sophisticated means, under U.S.S.G. § 2B1.1(b)(10)(C). After applying these and other enhancements, Yousef's advisory Sentencing Guidelines range was 97 to 121 months' imprisonment. The district court sentenced Yousef to 109 months' imprisonment. He timely appealed.

## II.

Yousef challenges the procedural reasonableness of his sentence. A district court imposes a procedurally unreasonable sentence by "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). We review the procedural reasonableness of a defendant's sentence for an abuse of discretion. *Id.*

On appeal, Yousef argues that the district court improperly calculated his Guidelines range when it applied: (1) three sentencing enhancements based on the conduct of his coconspirators, and (2) an enhancement for using sophisticated means. We address each argument in turn.

## A.

We consider first whether the district court properly applied the sentencing enhancements for theft from the person of another, possession of a dangerous weapon, and physical restraint of a victim. Yousef did not personally commit the acts underlying these enhancements; his coconspirators did. Still, the district court found the coconspirators' actions attributable to Yousef as "relevant conduct." In cases involving "jointly undertaken criminal activity," relevant conduct encompasses:

> all acts and omissions of others that were—
>
> (i)     within the scope of the jointly undertaken criminal activity,
>
> (ii)    in furtherance of that criminal activity, and

> (iii)    reasonably foreseeable in connection with that criminal
> activity;
>
> that occurred during the commission of the offense of conviction,
> in preparation for that offense, or in the course of attempting to
> avoid detection or responsibility for that offense[.]

U.S.S.G. § 1B1.3(a)(1)(B).  We review de novo whether acts or omissions constitute relevant conduct under this guideline.  *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018).  And we review the district court's underlying factual findings for clear error.  *United States v. Smith*, 79 F.4th 790, 794 (6th Cir. 2023).  The government bears the burden of proof to show that an enhancement qualifies as relevant conduct.  *United States v. Amerson*, 886 F.3d 568, 573 (6th Cir. 2018).

Start with what is not in dispute.  Yousef does not contest the district court's factual findings that his coconspirators "displayed firearms, detained victims, and, in at least one instance, stole a victim's personal cell phone."  D. 10 at p.20.  And he does not argue that his coconspirators' actions were unforeseeable; nor does he suggest that their actions were not in furtherance of criminal activity.  Thus, the only question is whether the robberies—and the conduct that occurred during their commission—were "within the scope of the jointly undertaken criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B)(i).

The scope of the jointly undertaken criminal activity "is not necessarily the same as the scope of the entire conspiracy."  *Donadeo*, 910 F.3d at 894–95 (quotation omitted).  Instead, it is "the scope of the specific conduct and objectives embraced by the defendant's agreement."  *Id.* at 895 (quotation omitted).  That agreement may be explicit, or it may be an "implicit agreement fairly inferred from the conduct of the defendant and others."  *Id.* (quotation omitted).  The district court must make "particularized findings" about "the scope of the defendant's agreement" before holding him accountable.  *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002) (emphasis omitted).

We consider six factors when "determining the scope of the criminal activity that a defendant agreed to jointly undertake.  *Donadeo*, 910 F.3d at 895.  Those factors are: "(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme;

and (6) length and degree of the defendant's participation in the scheme." *Id.* (quotation omitted). The district court need not find that all six factors support its determination that the defendant engaged in jointly undertaken criminal activity. We have upheld a district court's conclusion that others' actions were attributable to the defendant when only four factors weighed against the defendant. *See United States v. Moody*, 787 F. App'x 857, 869–70 (6th Cir. 2019).

Five of the six *Donadeo* factors weigh against Yousef. So the district court did not err in its application of the theft, dangerous-weapon, and physical-restraint enhancements.

*Existence of a single scheme.* Yousef's conduct and the robberies were part of a single scheme—that is, to resell stolen cell phones *obtained from robberies*. We must be precise when defining the boundaries of this scheme, and it is not enough to say that Yousef's shared objective with the robbers was merely to profit off stolen phones no matter where they came from. The fact that the phones were obtained during armed robberies—robberies Yousef knew about, encouraged, and in some cases helped plan—was central to the success of the entire enterprise. We see no indication that he used alternative supply chains to obtain illegal phones, so without these robberies, he would have had no inventory. Indeed, Yousef was often eager to replenish his stock, once texting a middleman to complain, "Man try to get more stuff." R. 110, PageID 1216. Given Yousef's awareness of where his merchandise came from, combined with his substantial involvement in the finer details of the robberies, we can infer the existence of an agreement that the thieves would commit more robberies to maintain Yousef's inventory of stolen phones.

In turn, Yousef was as essential to the robbers as the robbers were to Yousef. He provided them with critical technical and market expertise, "cleaning" stolen phones of identifying information and locating overseas buyers willing to pay huge markups. He also provided vital transportation and logistical support. After the robberies on November 15, 2020, and January 20, 2021, the thieves contacted Yousef the same day, and within hours Yousef was on the road to pick up the phones and transport them out of state. Thus, he was more like a "getaway driver in an armed bank robbery" than an impersonal broker offering generalized services. *See* U.S.S.G. § 1B1.3 cmt. n.4(B).

Yousef needed the robbers, and the robbers needed Yousef.  And when coconspirators rely on each other's labor and expertise, there is a strong inference of a single scheme.  For example, in *United States v. Cowley*, we attributed the conduct of coconspirators to a defendant who performed "critical tasks" in service of the other participants' conduct.  800 F. App'x 402, 405 (6th Cir. 2020).  And in *United States v. Love*, we attributed coconspirator conduct to a defendant who "recruited others and provided logistical support" for the conspiracy.  392 F. App'x 410, 417–18 (6th Cir. 2010).  Given Yousef's essential contributions to the robbers' efforts, we have little difficulty concluding that the robberies were part of the same scheme as Yousef's transportation and resale of the stolen merchandise.

Yousef disagrees.  He maintains that his only scheme was to purchase stolen cell phones and transport them over state lines, not commit robberies.  He was "not interested in how the robbers obtained the phones."  D. 10 at p.29.  Yet his text messages tell a different story.  For example, Yousef encouraged the robberies and even provided specific directives to the robbers, recommending that they favor certain stores and phone models and providing guidance on how to evade authorities.

Yousef next argues that the relevant-conduct enhancements were improper under *United States v. McReynolds*, 69 F.4th 326 (6th Cir. 2023).  There, we reversed the district court's decision to hold the defendant responsible for drug quantities attributed to a larger conspiracy where the defendant was a street-level dealer who occasionally purchased product from the conspiracy's supplier.  *Id.* at 333–34.  But Yousef's actions are easily distinguishable from the *McReynolds* defendant's actions.  Unlike Yousef, that defendant never "coordinated his . . . sales with the other conspiracy members or performed a specific service for the conspiracy."  *Id.* at 333.  By contrast, Yousef timed his trips to Michigan to the schedule of robberies.  And the services he provided for the conspiracy were far more specialized than those of a street-level dealer selling a small fraction of a supplier's total stock.

*Similarities in modus operandi.*  The robbery-and-resell scheme followed a familiar pattern.  Yousef would encourage his coconspirators to obtain stolen phones, at times directing the robbers to specific retailers or cities.  The robberies would take place.  Yousef would meet with his middleman to pay for the phones.  He would then resell the phones for a significant

profit.  True, sometimes Yousef would meet directly with a robber instead of a middleman.  And sometimes the coconspirators were forced to improvise to escape the pursuit of law enforcement, thereby deviating from the usual plan.  Still, there are enough similarities to conclude that this factor favors the government.  Yousef offers nothing in response beyond saying the factor is "not applicable."  D. 10 at p.16.

*Coordination of activities*.  Direct evidence shows extensive coordination among Yousef and other participants in the conspiracy.  Yousef discussed plans for future robberies with coconspirators, frequently offering advice on which cities to target and which devices to steal.  Over a four-week period, he exchanged over 200 messages with a single middleman, in which the two discussed logistics, phone models, police investigations, and other topics related to the robberies.  We have held that discussions among coconspirators—about how to carry out the scheme or how to conceal it—constitute coordination.  *See Donadeo*, 910 F.3d at 897.

Yousef nevertheless argues that the directives he provided to the thieves did not constitute coordination.  He explains that it is "typical for a professional fence to indicate his/her interest in more stolen goods and to also indicate what brands of goods he/she was willing to buy."  D. 10 at pp.35–36.  But Yousef's conduct went well beyond that of a neutral buyer.  According to Akevion McCoy, a middleman between Yousef and the individuals responsible for the January 20, 2021 robbery, Yousef was the only buyer McCoy ever contacted as part of the scheme.  Add to that the same-day pickups, and a picture emerges of Yousef as an active and enthusiastic participant in a scheme to sell the spoils of armed robberies—as opposed to a passive buyer who signals what he will buy and waits patiently for inventory to arrive.

*Pooling of resources or profits*.  There is no evidence that Yousef pooled resources or profits with his coconspirators.  This factor weighs in his favor.

*Knowledge of the scope of the scheme.*  Yousef knew about the armed robberies.  In text messages, he stated that his merchandise came from robberies and even shared a news article describing the robbers' aggressive tactics.

Yousef does not dispute that he knew about the robberies.  Instead, he argues that such knowledge has little bearing here because "[e]very professional fence knows that he/she is

buying stolen goods." *Id.* at 36. And Yousef does not stop there. He contends that the district court's application of a professional-fence enhancement—which he does not challenge—categorically prohibits us from implicating him in the robbers' conduct. A fence, he explains, is a person who buys and sells stolen goods, thereby "induc[ing] others to commit property crimes by providing them with a ready market for their stolen goods." *United States v. Nicolescu*, 17 F.4th 706, 723 (6th Cir. 2021). It follows, then, that a person who sells goods that he stole himself cannot be a fence because the only theft crimes he induces are his own. So, Yousef concludes, if the district court is correct that he is a professional fence—meaning he strictly sells property stolen by others—then it is impossible for conduct related to the theft of that same property to be attributed to him for sentencing.

For this point, Yousef relies on *Nicolescu*. There, we held that the district court erred in applying fence enhancements to conspirators in a fraud and identity-theft scheme, where the participants stole and sold credit card information. *Id.* at 713. We reasoned that a defendant cannot be both fence and thief, because a person cannot "'receive' goods he himself stole." *Id.* at 722. But *Nicolescu* does not help Yousef. *Nicolescu* addresses when we may apply the fence enhancement. It says nothing about whether a fence can be subject to other enhancements.

*Length and degree of Yousef's participation in the scheme.* Yousef had significant involvement in the robbery-and-resale scheme. Without Yousef, there is no scheme, as he seems to be the only coconspirator with the means, skills, and opportunities to make the robberies a reliably profitable enterprise. And he participated for the duration of scheme. To that end, cell-phone data and license-plate toll records show Yousef's involvement in eleven robberies over the course of nearly a year. In these robberies, Yousef's coconspirators, at Yousef's request and for his benefit, stole merchandise valued at $330,194.93.

Yousef's only response is that there were multiple schemes, not a single scheme. But we have addressed and rejected this argument.

\*     \*     \*

A majority of the *Donadeo* factors supports the district court's findings that the possession of firearms, theft of a cell phone from a store employee, and physical restraint of store

employees during the robberies were within the scope of Yousef's jointly undertaken criminal activity.  And because Yousef does not contest that these actions were in furtherance of criminal activity and reasonably foreseeable, the district court did not err in applying the theft, dangerous-weapon, and physical-restraint enhancements.

**B.**

Next, Yousef challenges the district court's application of the sophisticated-means enhancement.  We review the district court's legal conclusions de novo and its factual findings for clear error.  *United States v. Nunley*, 29 F.4th 824, 830 (6th Cir. 2022).  Our caselaw has not resolved whether we review the application of the enhancement to those factual findings for clear error or de novo.  *United States v. Karasarides*, 159 F.4th 972, 997 (6th Cir. 2025).  But because Yousef's challenge fails under either standard, we need not take a side in the debate.

The Sentencing Guidelines call for a two-level enhancement for use of sophisticated means.  The sophisticated-means enhancement applies when "the offense . . . involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(C).  "Sophisticated means" are "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  *United States v. Simmerman*, 850 F.3d 829, 833 (6th Cir. 2017) (quoting U.S.S.G. § 2B1.1 cmt. n.9(B)).  Such conduct includes "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts."  *Id.* But that is not the only conduct that qualifies as sophisticated means.  In determining the sophistication of the offense, we consider the "totality of the defendant's conduct."  *United States v. Chappelle*, 78 F.4th 854, 862 (6th Cir. 2023) (quotation omitted).  An otherwise simple theft may nevertheless trigger the enhancement if the means to conceal the theft were sophisticated.  *See Simmerman*, 850 F.3d at 833.

The district court did not err in applying the sophisticated-means enhancement.  The clear weight of the evidence supports its determination that Yousef, using his technical expertise in cell-phone repair, bypassed phone manufacturers' anti-theft mechanisms to ensure the devices were saleable.  Yousef explained that he could "clean" a stolen phone of identifying information

so that it could be used without detection.  In fact, text messages show that he would charge $75 to perform this service on a single phone, indicating the value of this specialized knowledge.  He also relied on his technical expertise when he advised the thieves to avoid older cell phone models because they are easier for authorities to track.  So even if the robberies lacked sophistication, Yousef's efforts to avoid detection—for himself, his coconspirators, and his customers—were those of an industry pro.  *See id.* (upholding a sophisticated-means enhancement where a bank employee, who stole money by simply taking it out of the vault, used specialized industry and company knowledge to conceal her crime).

Moreover, Yousef operated on a global scale.  One investigator testified that some of the goods stolen in the January 20, 2021 robbery ended up in Hong Kong and Dubai, where an unlocked, untraceable iPhone fetches a much higher price than in the United States.  Yousef knew about these specialized markets and knew how to place his merchandise there—again, not the conduct of an ordinary dealer in black-market goods.  And aside from the scheme's international component, selling phones stolen in Michigan to buyers in Illinois suffices to support a sophisticated-means enhancement, as the use of multiple jurisdictions in furtherance of a crime is a signature example of sophisticated means.  *See United States v. Woodson*, 960 F.3d 852, 854 (6th Cir. 2020); *see also* U.S.S.G. § 2B1.1 cmt. n.9(B).

Yousef asserts that he did only what was necessary to ensure the goods were marketable and profitable, and therefore his conduct was not "especially complex or especially intricate." *See* U.S.S.G. § 2B1.1 cmt. n.9(B).  But whether Yousef's conduct was normal or ordinary behavior for a person dealing in stolen cell phones has no bearing on its sophistication.  Even if Yousef is correct that success in his chosen enterprise requires the sophistication seen here, that only justifies why the enhancement applies: without sophistication, Yousef would not have been able to maintain his illegal scheme and evade authorities for as long as he did.

## III.

For these reasons, we **AFFIRM** the district court's judgment.