NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0079n.06

Nos. 23-5270/5436

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Feb 11, 2025

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
|  | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE EASTERN |
|  | ) | DISTRICT OF KENTUCKY |
| CURTIS DEWAYNE MILLER (23-5270); | ) | |
| CRAIG DUPREE ROBERTSON (23-5436), | ) | OPINION |
| Defendants-Appellants. | ) | |
|  | ) | |

Before: CLAY, WHITE, and NALBANDIAN, Circuit Judges.

HELENE N. WHITE, Circuit Judge. Defendants-Appellants Curtis Dewayne Miller and Craig Dupree Robertson appeal the district court's denial of their motions to withdraw their guilty pleas. They also challenge various determinations made at sentencing, and Robertson raises a claim that counsel constructively denied him assistance during his sentencing. For the following reasons, we AFFIRM the district court in all respects.

## I.    Facts

In October 2021, a grand jury indicted Robertson and others on charges of conspiracy to distribute methamphetamine and fentanyl, possession with intent to distribute methamphetamine and fentanyl, conspiracy to commit money laundering, and other crimes. In June 2022, a superseding indictment added Miller to the drug-distribution and money-laundering conspiracy counts and also charged him with possession with intent to distribute. This indictment also included additional charges of possession with intent to distribute against Robertson. Robertson

pleaded not guilty to the charges, but two days before Miller's and Robertson's November 1, 2022, trial date, Robertson moved for rearraignment. On November 1, 2022, the district court engaged in a change-of-plea colloquy with Robertson, in which the court warned him that he faced a statutory maximum penalty of life imprisonment, and Robertson pleaded guilty (without a plea agreement) to all charges. On December 8, 2022, Robertson's counsel ordered a transcript of the November 1 proceedings.

On October 13, 2022, the district court denied Miller's motion to continue the November 1, 2022, trial. Miller's attorney then messaged Miller to say that although Miller should be able to waive his right to a speedy trial, "this is the one judge in America who will [get in Miller's way in doing so]." R. 421-1, PID 1911. As trial approached, Miller's counsel advised him that given the charges and evidence, counsel believed that if Miller "sen[t] this to a jury," he was "really going to regret it." *Id.* at 1915. By the time the trial began, the government had dismissed the money-laundering conspiracy and possession-with-intent-to-distribute charges against Miller. Because Robertson and other coconspirators had pleaded guilty by this time, Miller was the only remaining defendant.

On November 3, 2022, after three days of trial, the jury deadlocked, and the district court declared a mistrial. The district court granted the government's motion to reinstate the money-laundering-conspiracy charge, and Miller's second trial began on December 13, 2022. After the government concluded its opening statement, it called Sabrina Hager, the lead federal agent in the investigation, as a witness. Agent Hager testified that Robertson was the "head of the local [drug-trafficking] organization" and that Miller, who is Robertson's cousin, was Robertson's "right hand." R. 463, PID 2244–45. According to Agent Hager, Miller's responsibilities included acting as a "drug courier" and "stash house guardian," and he "assisted in money laundering as well." *Id.*

at 2245.  Greg Wilson—another cousin of Robertson's, and Miller's brother—resided in California and acted as the organization's "supplier."  *Id.* at 2245–46.  Drugs arrived from California by automobile or mail.  Brenda Nicole Fugate operated as the group's "primary distributor," and Miller delivered drugs to her for distribution.  *Id.* at 2247, 2250.  Through a network of subordinate dealers operating across several Kentucky counties, Fugate had the ability to distribute around twenty pounds of methamphetamine per week.  In February 2021, Robertson directed Fugate to rent an apartment that the parties refer to as the Steeplechase apartment.  Although the lease bore Fugate's name, Miller lived there from February to May 2021.

On December 14, the second day of the second trial, Miller pleaded guilty to the drug-distribution-conspiracy charge.  However, Miller moved to withdraw his guilty plea by a letter dated January 11, 2023, but not filed until January 20, 2023.[1]  Miller claimed that his attorney had "coerc[ed] [him] with impermissible pressure":  first, by emphasizing "the fear of rec[ei]ving a life sentence if I continued with trial"; second, by claiming that the district court and Assistant U.S. Attorney "had taken out a personal v[e]ndetta against" Miller and "would continue to re-try [Miller] until" a jury convicted him; third, by "threaten[ing] and coerc[ing]" Miller's family members to beg him to plead guilty; and fourth, by "promis[ing] that [counsel] would not defend [Miller] or prepare for another trial," including by declining to object to certain aspects of the government's opening statement at Miller's second trial.  R. 407, PID 1868–69.  Miller requested new counsel and a hearing to withdraw his guilty plea.

---

[1] Within the body of the letter, Miller indicates that he may have in fact written it on January 13, 2023.  *See* R. 407, PID 1868 (claiming that Miller's attorney had not filed the motion to withdraw "to this date of 01-13-23").

By January 12, 2023, the district court had already granted Miller's counsel permission to withdraw from the case. In a March 2023 memorandum opinion and order, the district court, after considering the applicable factors, rejected Miller's request to withdraw his guilty plea because Miller's counsel had not "exert[ed] undue influence or coercion" on Miller and because "Miller's motion [was] based on a tactical calculation" rather than a "fair and just reason." R. 431, PID 2005.

The district court sentenced Miller to 320 months' incarceration on March 27, 2023. Several aspects of the sentencing are at issue on appeal. First, although Miller's attorney argued that the district court should attribute only 4.5 pounds of methamphetamine to Miller, the district court instead found 39.5 pounds to be the "bare minimum number that should be attributed to" him. R. 493, PID 2585. This greater drug quantity increased Miller's offense level by four. Second, the district court applied a drug-house enhancement based on Miller's residence in the Steeplechase apartment; this determination added two points to Miller's offense level. Third, Miller requested a two-point minor-participant reduction based on, in his view, his relatively limited role in the drug-trafficking conspiracy. The district court declined to apply the reduction, finding that Miller's participation in the scheme indicated that he "understood the scope and the structure of the criminal activity" and acted as the "right-hand man of the main participant," Robertson. *Id.* at 2589.

Shortly before Miller's sentencing, Robertson advised the district court in a letter filed on March 16, 2023, that he "fe[lt] as though [his] lawyer ha[d] manipulated [him] into signing a plea agreement that" did not "represent[] [him] best." R. 436, PID 2015. Robertson claimed that he "felt scared at the time of [his] rearrai[gn]ment and made agreements [he] wish[ed]" he had not. *Id.* He therefore requested a change of counsel. (He did not, at that time, expressly mention withdrawing his guilty plea.) The district court addressed this issue at a hearing on March 27,

2023, and in an ex parte discussion, Robertson stated that although he did not claim complete innocence, he also denied a lot of the charges. R. 500, PID 2696–97; *see also id.* at 2697–98 (acknowledging that he was guilty of conspiracy but expressing concern about conduct of co-defendants in which he played no part). Robertson also reiterated that his counsel advised him to plead guilty to avoid a life sentence, but upon seeing the presentence report, he believed that he was going to get a life sentence anyway. At the conclusion of this hearing, the district court agreed to appoint Robertson new counsel.

In a letter filed on April 25, 2023, Robertson expressly sought to withdraw his guilty plea on the ground that his attorney advised him that he "would be given leniency" if he pleaded guilty, "but that does not seem to be the case." R. 467, PID 2374. Robertson also claimed that the fear, stress, and anxiety caused by a potential life sentence and its impact on his family members prevented him from "fully grasp[ing] the severity of" pleading guilty. *Id.* The district court held a hearing on Robertson's motion to withdraw his guilty plea on May 1, 2023. The district court questioned Robertson's request by highlighting Robertson's prior admission of guilt and asking, "So your position now is you lied to me at the time you entered your guilty plea?" R. 504, PID 2876. Robertson, referencing the evidence introduced at Miller's first trial, reiterated that "that wasn't [Robertson's] stuff, the evidence stuff, the meth." *Id.* at 2877. The district court then read the transcript of Robertson's change-of-plea hearing and again asked Robertson whether his admissions were "all a lie[.]" *Id.* at 2884. Robertson reiterated that his attorney had pressured him and that Robertson wanted to withdraw his guilty plea "the day after" he had entered it. *Id.* at 2894. The district court denied Robertson's motion to withdraw his guilty plea after considering the relevant factors and concluding that none supported Robertson's request.

The district court ultimately sentenced Robertson to 490 months' incarceration to be served consecutively to Robertson's sentence in an Indiana criminal case. At sentencing, the district court gathered information about the Indiana case in part by questioning Patricia Morgan, who was Robertson's girlfriend and whose name Robertson had used to send narcotics through the mail, leading to the Indiana charges. The government, in support of its requested sentence, cited Robertson's criminal history, including that the Indiana case was pending when Robertson engaged in the instant conspiracies. The district court then reviewed the applicable factors under 18 U.S.C. § 3553(a), highlighting Robertson's significant criminal history and his role "at the top of the pyramid." R. 505, PID 2847–48. The district court did not, however, expressly tie any of these considerations to its determination that Robertson's sentence should "run consecutive[ly] to any additional penalty that may be imposed in the case from Indiana." *Id.* at 2851; *see also id.* at 2854 (again noting that the sentence would be consecutive without further explanation).

After discussing Robertson's sentence, the district court "ask[ed] counsel to state any objections that they may have . . . to the sentence that has been announced," including whether "either party would like the Court to make additional findings to support any of the matters that have been announced." *Id.* at 2857. Neither the government nor Robertson's attorney lodged any further objections or requested additional findings. *Id.* at 2857–58. Robertson, after being advised of his appellate rights, "object[ed] to the sentence" without further explanation and "object[ed] to ineffective assistance of counsel" on the bases that they did not "see eye to eye," and that Robertson had whispered statements to counsel that counsel did not state on the record. *Id.* at 2859. The district court determined that it was not necessary to rule on those objections at that time.

## II.    Analysis

### A.  Withdrawal of Robertson's and Miller's Guilty Pleas

We review the denial of a motion to withdraw a guilty plea for abuse of discretion.  *United States v. Bashara*, 27 F.3d 1174, 1180 (6th Cir. 1994), *superseded on other grounds*, U.S. Sent'g Guidelines Manual § 3B1.1 cmt. n.2 (U.S. Sent'g Comm'n 1993), *as recognized in United States v. Caseslorente*, 220 F.3d 727 (6th Cir. 2000).  As applicable here, Rule 11 of the Federal Rules of Criminal Procedure provides that once a district court accepts a defendant's guilty plea, the defendant may withdraw it before sentencing if "the defendant can show a fair and just reason for requesting the withdrawal."  Fed. R. Crim. P. 11(d)(2)(B).  The defendant has the burden of establishing a fair and just reason.  *United States v. Triplett*, 828 F.2d 1195, 1197 (6th Cir. 1987) (gathering cases).

We have explained that "the aim of the rule is to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant 'to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes he made a bad choice in pleading guilty.'"  *Bashara*, 27 F.3d at 1181 (quoting *United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991) (per curiam)).  To assess whether a defendant has established a "fair and just reason" or is instead "mak[ing] a tactical decision," courts consider the following factors:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

*Id.* These factors "are a general, non-exclusive list and no one factor is controlling." *United States v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir. 1996) (per curiam); *see also United States v. Haygood*, 549 F.3d 1049, 1052 (6th Cir. 2008) ("The relevance of each factor will vary according to the 'circumstances surrounding the original entrance of the plea as well as the motion to withdraw.'" (quoting *Triplett*, 828 F.2d at 1197)).

### 1. Robertson

The district court did not abuse its discretion when it considered the *Bashara* factors and concluded that Robertson failed to establish a fair and just reason to withdraw his guilty plea. First, the district court held that Robertson had not sought to withdraw his guilty plea until "around the middle of March [2023]"—or 4.5 months after the November 1, 2022, guilty plea—when Robertson's counsel stated that a conflict with Robertson required counsel to withdraw from the case. R. 504, PID 2902. The district court found this to be "a significant period of time" that "elapsed without any indication of dissatisfaction either with counsel or that the defendant had changed his mind." *Id.* at 2902–03. The district court concluded that the circulation of the presentence report (and its guidelines range of life imprisonment) "may have been the precipitating factor that then led to [Robertson's mid-March] letter." *Id.* at 2903.

Second, the district court found that it had "not been given a straight answer that [it] could accept as to if there was a valid reason for requesting to withdraw earlier, more close in time to the time the plea was entered in the case." *Id.* Third, the district court acknowledged that Robertson at times "asserted innocence in the case," but at his change-of-plea hearing, Robertson also "freely and voluntarily acknowledged his guilt to each of th[e] counts" with which he was charged. *Id.* at 2903–04. Fourth, the district court noted that Robertson "entered a plea on the morning of trial after a significant amount of information, discovery had been provided, including plea agreements

in the case from co-defendants. And at that time, it would have been known to the defendant and his counsel that there were several co-defendants that were lined up to testify in the case against him." *Id.* at 2904. Fifth, the district court found that Robertson was "competent and able to understand the questions" when entering his guilty plea, had "some college education," and had "work experience." *Id.* Sixth, based on Robertson's criminal record, the district court found that he had "significant experience" with the criminal justice system. *Id.* at 2905. Seventh, the district court found that even if the foregoing factors favored permitting Robertson to withdraw his guilty plea, the "significant prejudice" to the government from having to try the case again would outweigh those considerations. *Id.*; *see also id.* at 2874–75 (discussing prejudice).

Robertson claims that the district court erred in several ways. First, he argues that the district court impermissibly evaluated Robertson's guilt when it referred to the strength of the government's potential case against him. We do not share Robertson's interpretation of the district court's comments. *See* R. 504, PID 2875–76, 2899. The court referenced the "mountain of evidence presented against" Robertson in Miller's trial only after Robertson stated, "I always told [counsel] that I wasn't there, that wasn't my stuff, like, it wasn't mine." *Id.* at 2875. The district court tied this observation to the third *Bashara* factor—whether the defendant has asserted or maintained his innocence—by contrasting Robertson's recent assertions of innocence with his admissions of guilt at his change-of-plea hearing. *Id.* at 2875–83. Within this context, the district court was simply pressing Robertson to explain the discrepancy between his initial sworn statements in tendering his guilty plea and his more recent claim of innocence. Similarly, when the district court stated that "there was a lot of [direct and circumstantial evidence] . . . presented during Mr. Miller's trial," the court did so to clear up Robertson's apparent mistaken belief that, in the court's words, Robertson "couldn't be convicted of some of these offenses" unless he was

"caught red-handed with drugs in [his] possession." *Id.* at 2899. Again, context makes clear that the district court did not decline to permit Robertson to withdraw his guilty plea because the court itself impermissibly concluded that Robertson was guilty.

Second, Robertson argues that rather than focusing on the *Bashara* factors, the district court was more interested in "browbeat[ing]" Robertson regarding his prior admissions of guilt and warning Robertson that his seeking to withdraw his guilty plea could cause him to lose the two-point reduction for acceptance of responsibility. Robertson Br. 12–13. The district court indeed challenged Robertson regarding whether he "lied" when he acknowledged guilt as to all charges at his change-of-plea hearing. R. 504, PID 2876, 2883–84. However, context indicates that the court was simply attempting to elicit a final, informed answer from Robertson regarding his guilt or innocence—an inquiry that bears on several *Bashara* factors, including whether Robertson consistently maintained his innocence, as well as the circumstances underlying the entry of the guilty plea. Contrary to Robertson's assertion that this issue was "a centerpiece of [the district court's] inquiry," Robertson Br. 12, the district court ultimately reviewed all *Bashara* factors and did not place undue weight on Robertson's vacillation.

Nor do we find any basis to fault the district court for advising Robertson of the potential consequences of his motion to withdraw his guilty plea. The record indicates that Robertson was not afraid to reject the advice of counsel and make requests to the district court directly (rather than through counsel). Robertson acknowledged that the district court had answered "every question [and] every letter" of his and that he "appreciate[d] that." R. 504, PID 2896. It was therefore not inappropriate for the district court to inform Robertson of his options and their consequences—as it had done throughout the case—especially when the district court's warning was accurate. *Cf. United States v. Wallace*, 832 F. App'x 949, 952–53 (6th Cir. 2020) (stating that

because a district court may decline an acceptance-of-responsibility reduction where it determines that a defendant's objection is a "false denial or frivolous," it was not abuse of discretion for the court to accurately warn the defendant of this possibility, nor did it chill defense counsel's representation of the defendant).[2]

Third, Robertson challenges the district court's evaluation of the *Bashara* factors. Addressing the first factor—the amount of time that elapsed between the plea and the motion to withdraw it—Robertson argues that the district court incorrectly found the relevant delay to be the 4.5 months between Robertson's guilty plea on November 1, 2022, and the mid-March indications that Robertson was dissatisfied with his attorney and might want to withdraw his guilty plea. Robertson points to his statement at the May 2023 hearing that he "want[ed] to withdraw . . . [t]he day after [he] did it," but counsel "didn't let [him]." R. 504, PID 2894. For further support, Robertson points to the fact that on December 8, 2022, his attorney ordered a transcript of Robertson's change-of-plea hearing, which counsel allegedly would not have done unless Robertson and counsel discussed the plea shortly after the hearing on November 1, 2022.

But it was not an abuse of discretion for the district court to reject this claim. As the court reasoned, Robertson had "been writing to [the court] quite a bit in the case," *see, e.g.*, R. 151 (letter from Robertson requesting a new attorney); R. 153 (letter from Robertson requesting a bill of particulars), yet Robertson did not indicate that he wished to withdraw his guilty plea until mid-March, after he would have received the presentence report that recommended a guidelines range

---

[2] We reject Robertson's claim that the government failed to address the argument that the district court considered improper factors in its *Bashara* analysis and has therefore forfeited the issue. The government addressed the improper-factors argument, including the district court's consideration of the evidence against Robertson and his previous sworn admissions of guilt. *See* Gov't Br. 29–30.

of life, R. 504, PID 2901–03; *see United States v. Carpenter*, 554 F. App'x 477, 482 (6th Cir. 2014) (doubting that the defendant's counsel coerced him into pleading guilty where the "timing suggests that [the defendant] was disappointed with the recommended sentencing range and chose as a strategic matter to attempt to withdraw his guilty plea and take his chances at trial").[3] The district court did not abuse its discretion in finding that the 4.5-month delay favored denying Robertson's motion. *See United States v. Ellis*, 470 F.3d 275, 281–82 (6th Cir. 2006) (gathering cases approving denials for delays of as little as five weeks); *cf. United States v. Durham*, 178 F.3d 796, 798–99 (6th Cir. 1999) (77-day delay was "[t]he strongest factor supporting the district court's denial of [the defendant's] motion").

Robertson's willingness to contact the district court also cuts against him for purposes of the second factor, the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings. As the district court found, Robertson failed to provide any explanation for why he waited until mid-March to send a letter to the district court. *Cf. Carpenter*, 554 F. App'x at 482 (rejecting the defendant's argument that changing counsel delayed his motion, because "if [the defendant] really wished to withdraw his guilty plea, he could have expressed his intention to the court").

Nor did the district court abuse its discretion in concluding that the remaining *Bashara* factors favor denying Robertson's motion. Regarding the third factor—whether the defendant has

---

[3] Robertson replies that there is no specific evidence in the record indicating that he reviewed the presentence report before moving to withdraw his guilty plea, but the district court did not abuse its discretion by considering the "totality of the circumstances pertaining to the timing of [the defendant's] motion." *Carpenter*, 554 F. App'x at 482. Nor are we persuaded by Robertson's claim that the district court did not consider that the delay may have been caused by Robertson's counsel's international travel for "most of February." Robertson Reply 2. As the district court emphasized, Robertson was not shy about reaching out to the court directly.

asserted or maintained his innocence—Robertson argues that because he "did protest his innocence at several points in the proceedings[,] . . . this factor also weighs in" his favor. Robertson Br. 14–15. Such a finding would be inconsistent with our case law. Robertson accepted complete responsibility at the change-of-plea hearing, asserted partial innocence and partial guilt at the ex parte hearing, and finally asserted total innocence at sentencing. That vacillation is a far cry from the "vigorous and repeated protestations of innocence" that "may support the decision to allow withdrawal of a guilty plea." *Carpenter*, 554 F. App'x at 482 (quoting *United States v. Baez*, 87 F.3d 805, 809 (6th Cir. 1996)). Instead, "claims of innocence are not convincing when the defendant has vacillated over time." *Id.*; *see also United States v. Martin*, 668 F.3d 787, 796 (6th Cir. 2012) ("In seeking withdrawal of the plea, [the defendant's] only concern seemed to be with the length of the sentence and not the adjudication of guilt. Statements of guilt under oath at a plea hearing support the district judge's decision not to permit withdrawal.").

As to the circumstances underlying the entry of the guilty plea, Robertson claims that on receiving certain pretrial discovery from the government, his counsel advised him to plead guilty to avoid a life sentence. Robertson argues that although he has said that he would not have pleaded guilty but for this guidance, "[c]ounsel was never asked what advice he gave Robertson, or the circumstances surrounding that weekend" before trial. Robertson Br. 15. The government, in turn, points its finger at Robertson, who bears the burden of establishing grounds for withdrawing his guilty plea and could have offered counsel's testimony. The evidence that we *do* have before us indicates that Robertson understood the charges, appreciated the attendant penalties (including a potential life sentence), and entered his guilty plea without any promises or threats affecting his decision. *See* R. 379, PID 1793–94, 1798.

Robertson acknowledges that the sixth factor—the defendant's prior experience with the criminal justice system—supports denying his motion.

Given that we affirm the district court's determinations regarding the first six *Bashara* factors, we need not consider the seventh—potential prejudice to the government—because "the government is not required to establish prejudice that would result from a plea withdrawal, unless and until the defendant advances and establishes a fair and just reason for allowing the withdrawal." *United States v. Spencer*, 836 F.2d 236, 240 (6th Cir. 1987); *accord, e.g.*, *Alexander*, 948 F.2d at 1004; *Triplett*, 828 F.2d at 1198. That said, a district court may nonetheless "consider potential prejudice in exercising its discretion in considering the motion," *Spencer*, 836 F.2d at 240, and the district court did not abuse its discretion in determining that this factor also favored denying Robertson's motion. In *Martin*, the defendant pleaded guilty on the second day of trial but sought to withdraw that guilty plea three months later at sentencing. 668 F.3d at 790–91. We held that when a defendant pleads guilty after "the government was prepared for (and had started) what was shaping up to be a lengthy trial[,] . . . the amount of time and effort it would take to restart a trial and the effect of delay on individuals' memories would be prejudicial." *Id.* at 797.[4] Further, we have previously noted that where codefendants were prepared to testify against a defendant, and that defendant seeks to withdraw his guilty plea after the district court sentenced the cooperating codefendants, the government suffers prejudice from the possibility that such

---

[4] Robertson cites *Martin*'s reference to a second trial starting "years later" as a point of distinction from this case, where Robertson requested to withdraw his plea 4.5 months later and a second trial would (in the best case) begin some short time thereafter. Robertson Br. 16. But the *Martin* defendant had similarly sought to withdraw his guilty plea three months after entering it, yet we stated on appeal that "the government would have to begin anew now *several years later* should he be allowed to withdraw." 668 F.3d at 789, 797 (emphasis added). Our use of "years later" makes clear that we did not consider solely the three months between the *Martin* defendant's guilty plea and the motion to withdraw it.

witnesses "would be less willing to cooperate in a future trial." *United States v. Mendoza-Almendarez*, 437 F. App'x 394, 399 (6th Cir. 2011); *United States v. Carson*, 32 F.4th 615, 625 (6th Cir. 2022) (considering that "the government 'might be hampered in its ability to bring back for testimony' the already-sentenced codefendants." (quoting *United States v. Carson*, No. 18-cr-204(2), 2021 WL 2581300, at *2 (S.D. Ohio June 23, 2021))). This factor therefore favors denying Robertson's motion.

In sum, the district court did not abuse its discretion when it denied Robertson's motion to withdraw his guilty plea.

### 2. Miller

Miller presents the fourth *Bashara* factor—the circumstances underlying the entry of the guilty plea—as the primary consideration that favors permitting him to withdraw his guilty plea. Miller argues that his counsel's statements to him, before and after the first trial, led Miller to believe "that the deck was stacked against him and that a plea was really his only option." Miller Br. 10. The district court discounted this claim on various bases. First, notwithstanding counsel's warnings before both trials, Miller had the confidence to reject that advice and proceed to trial both times. Second, the core of Miller's counsel's advice concerned the strength of the government's case and the risk that Miller could face life imprisonment if he proceeded to trial, and it was counsel's obligation to inform Miller of these risks. The district court further noted that although the statutory maximum of life imprisonment exceeded Miller's likely sentencing guidelines range, counsel's overestimation was not a basis to withdraw Miller's guilty plea under our case law. Third, at Miller's change-of-plea hearing, he affirmed under oath that no one had "in any way forced [him] to enter a guilty plea in the case." R. 424, PID 1949.

The district court did not abuse its discretion in finding that the circumstances surrounding Miller's guilty plea did not favor granting his motion. Miller claims that (1) after the district court denied Miller's motion to continue the trial, Miller's counsel told him that "this is the one judge in America who will [get in Miller's way]," R. 421-1, PID 1911; (2) Miller's counsel predicted that if Miller "sen[t] this to a jury," he was "really going to regret it," *id.* at 1915; and (3) as Miller's second trial approached, his counsel overemphasized the probability of receiving a life sentence for proceeding with another trial, stated that the district court and prosecution had a vendetta against Miller, had Miller's family members pressure him to plead guilty, and threatened not to defend Miller at the second trial, R. 407, PID 1868–69.

But as the district court noted, the weight of the comments made before the first trial is mitigated by the fact that Miller did not feel so coerced that he could not reject the advice and proceed to trial. The same is true of the second trial, but to a lesser extent, because Miller pleaded guilty on the second day of that trial and had received messages from counsel on the first day and the morning of the second. *See* R. 421-1, PID 1932–33. But as to both trials, "[c]ounsel must bring to bear his or her professional experience and judgment in advising the defendant during the course of a prosecution. The probability of conviction and the factors affecting sentencing are proper subjects of the attorney's advice." *United States v. Dumersier*, 19 F.3d 20 (6th Cir. 1994) (per curiam) (unpublished table decision) (internal citation omitted) (citing *Smith v. United States*, 265 F.2d 99, 100–01 (D.C. Cir. 1959)); *see also United States v. Juncal*, 245 F.3d 166, 172 (2d Cir. 2001) ("Nor does defense counsel's blunt rendering of an honest but negative assessment of appellant's chances at trial, combined with advice to enter the plea, constitute improper behavior or coercion that would suffice to invalidate a plea."); *United States v. Buckles*, 843 F.2d 469, 472 (11th Cir. 1988) ("A defendant cannot complain of coercion where his attorney, employing his

best professional judgment, recommends that the defendant plead guilty."); *United States v. Vargas*, 601 F. App'x 481, 482 (9th Cir. 2015) ("[A] frank assessment of [the defendant's] predicament does not amount to coercion," and, in fact, "trial counsel would have been derelict in his duty to [the defendant] had he not provided an honest opinion of [the defendant's] chances of success if he took his case to trial."). And although counsel indeed overestimated when he stated that "your guidelines will be 'life,'" R. 421-1, PID 1926, we have held that "the mere fact that an attorney incorrectly estimates the sentence a defendant is likely to receive is not a 'fair and just' reason to allow withdrawal of a plea agreement," *United States v. Stephens*, 906 F.2d 251, 253 (6th Cir. 1990); *see also Ramos v. Rogers*, 170 F.3d 560, 565 (6th Cir. 1999) (holding that a "proper colloquy can be said to have cured any misunderstanding [a defendant] may have had about the consequences of his plea"); R. 424, PID 1952 (informing Miller that until the district court "resolve[s] any objections" to the presentence report, "it will be impossible for the Court *or for your attorney* to know exactly what the guideline range would be in this matter" (emphasis added)).[5]

Finally, the district court reasonably emphasized Miller's sworn statements at his guilty-plea hearing. Miller testified that he understood the charges, was satisfied with his attorney's representation, and was not "in any way forced . . . to enter a guilty plea in the case." R. 424,

---

[5] We likewise reject Miller's claim that his counsel encouraged (or, in Miller's view, coerced) Miller's family members to pressure him to plead guilty. First, Miller has not pointed us to evidence in the record that these communications occurred. Second, "[w]e have consistently held that 'family pressure . . . is not the type of coercion that makes a defendant's acceptance of a guilty plea involuntary.'" *United States v. Baker*, No. 21-3159, 2022 WL 1017957, at *5 (6th Cir. Apr. 5, 2022) (quoting *United States v. Gasaway*, 437 F. App'x 428, 435 (6th Cir. 2011)), *cert. denied*, 143 S. Ct. 242 (2022). Similarly, the record contradicts Miller's claim that counsel refused to represent him at the second trial. Counsel in fact messaged Miller that notwithstanding counsel's concerns about the second trial, counsel had "gone above and beyond" offering Miller the representation he was "entitled to under the [C]onstitution." R. 421-1, PID 1928.

PID 1948–49. We have repeatedly held that absent exceptional circumstances, a defendant is bound by such statements. *See Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986) ("[W]here the court has scrupulously followed the required procedure, 'the defendant is bound by his statements in response to that court's inquiry.'" (quoting *Moore v. Estelle*, 526 F.2d 690, 696–97 (5th Cir. 1976))); *Smith v. Cook*, 956 F.3d 377, 394 (6th Cir. 2020) ("Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." (alterations omitted) (quoting *Lee v. United States*, 582 U.S. 357, 369 (2017))); *United States v. Todaro*, 982 F.2d 1025, 1030 (6th Cir. 1993) ("[A] defendant who expressly represents in open court that his guilty plea is voluntary 'may not ordinarily' repudiate his statements to the sentencing judge." (quoting *Fontaine v. United States*, 411 U.S. 213, 215 (1973))).[6]

The district court's application of the remaining *Bashara* factors was also sound. As to the length of and reason for delay in filing a motion to withdraw the guilty plea, the first and second factors, Miller presents a closer case than Robertson. But the district court did not abuse its discretion when it found that, regardless whether the delay was thirty-seven days (using the date on which Miller filed his motion) or twenty days (crediting Miller's claim that he asked counsel to file a motion on January 3, 2023), Miller's request was tactical.

Given that the cornerstone of the inquiry "is to allow a hastily entered plea made with unsure heart and confused mind to be undone," *Bashara*, 27 F.3d at 1181 (internal quotation marks

---

[6] Although we affirm the district court's conclusion that Miller's attorney did not coerce Miller into pleading guilty, we must note that counsel's bluntness was at times unprofessional. *See* R. 421-1, PID 1928, 1930–32. Counsel's patent frustration with Miller may provide some basis to question counsel's ability to effectively represent Miller, but Miller has not raised an ineffective assistance of counsel claim at this time, and any such claim is best explored through a motion pursuant to 28 U.S.C. § 2255. *See infra* § II.D.

omitted), we "look with particular favor on . . . motions made . . . within a few days after the initial pleading," *Spencer*, 836 F.2d at 239 (quoting *United States v. Roberts*, 570 F.2d 999, 1008 (D.C. Cir. 1977)). Although a twenty-day delay falls among the shorter delays in our cases, the district court doubted that it took Miller that much time to realize that his decision was the product of alleged coercion. Miller has, indeed, failed to explain, before the district court or this court, his reasons for waiting twenty days before expressing a desire to withdraw his guilty plea. Searching for context, the district court noted the uncommon situation Miller found himself in: When he pleaded guilty, he did so after sitting through the government's entire case in the first trial and the government's opening statement and first witness at the second trial—that is, he pleaded guilty with "full and complete knowledge of the evidence that likely would be considered by the jury." R. 431, PID 1997. The district court found that this timing suggested that Miller's decision to plead guilty was a voluntary, informed one—not a product of coercion.

We took a similar approach in *Carpenter*, where we faulted the defendant for "kn[owing] at the [plea] hearing the grounds upon which he [sought] to withdraw his plea," but we also acknowledged that "under some circumstances, it might be unreasonable for this court to expect a defendant to accuse his attorney of coercion when the attorney stands by his side to represent him." 554 Fed. App'x at 481–82. In those circumstances, "coercion both forces a defendant into pleading guilty and prevents the defendant from attempting to withdraw his plea." *Id.* Ultimately, we resolved the situation by finding that "the timing of [the defendant's] motion to withdraw his guilty plea remain[ed] suspect," because the defendant did not promptly file his motion even with new counsel, and when he did file it, he did so shortly after learning of an unfavorable sentencing-range recommendation. *Id.* at 482. Here, we cannot say that the district court abused its discretion in finding a somewhat short delay problematic given the unique circumstances of Miller's guilty plea.

The foregoing also makes clear that neither *Carpenter* nor this opinion imposes, as Miller claims, an impossible requirement that defendants must move to withdraw their guilty plea at the same time they enter it.[7]

Turning to maintenance of innocence, it is indeed true, as Miller argues, that he acknowledged guilt only at his change-of-plea hearing, and any defendant seeking to withdraw a guilty plea will necessarily seek to retract that lapse in maintaining innocence. But it is likewise true that Miller did not make "vigorous and repeated protestations of innocence." *Id.* at 482 (quoting *Baez*, 87 F.3d at 809). The district court noted that Miller reportedly made no claim of innocence in plea negotiations or shortly before pleading guilty. And as the government points out, Miller's letter requesting withdrawal of his guilty plea focuses more on his claim of coercion and arguably asserts only an equivocal claim of innocence. *See* R. 407, PID 1868–70 (seeking "to have [Miller's] guilt or innocence to be determined at trial, where [Miller] believe[s] the truth would come out"). On the other hand, we acknowledge that Miller asserted his innocence to his attorney in at least two messages and also went to trial before pleading guilty. *See* R. 421-1, PID 1924, 1933. This factor, therefore, is neutral.

Miller describes the fifth and sixth factors—his nature and background, and his prior experience with the criminal justice system—as "minimal when compared to the other[]" codefendants. Miller Br. 15. He acknowledges, however, that he "knows how to read and write"; "had the capacity to understand his actions"; and "has some experience with the criminal justice

---

[7] Finally, even if the length of delay should be found to favor Miller, it would only do so "slightly." *United States v. Lewis*, 800 F. App'x 353, 357 (6th Cir. 2020) ("Even if we were to accept 'two to three weeks' as the applicable time period, at best it would weigh only slightly in [the defendant's] favor." (citing *United States v. Jannuzzi*, No. 07-4521, 2009 WL 579331, at *3 (6th Cir. Mar. 6, 2009))). And given that the remaining factors, on balance, more convincingly favor denying Miller's motion, the district court still would not have abused its discretion.

system"—two convictions of possession with intent to distribute, the most recent in 2008. *Id.* The government emphasizes that this last conviction was in federal court, and although it was in 2008, Miller was under supervised release through 2015. The district court did not abuse its discretion in concluding that Miller's background and prior experience with the criminal justice system favor denying his motion.

In sum, the first factor (the time between the guilty plea and the motion to withdraw) at most only slightly favors granting Miller's motion; the second (reason for delay), fifth (Miller's nature and background), and sixth (prior experience with the criminal justice system) factors do not support Miller's request; the fourth factor (circumstances underlying the guilty plea), which represents the crux of Miller's argument, also does not support his request; and the third factor (maintenance of innocence) is neutral. On balance, this supports the district court's conclusion that Miller sought to withdraw his guilty plea for tactical reasons, not "fair and just" ones. As with Robertson's motion, the lack of a fair and just reason means that the government need not establish prejudice. But for the same reasons set forth in connection with Robertson's request, granting Miller's motion would have likewise prejudiced the government.

### B. Calculating Miller's Offense Level

Miller challenges various aspects of his sentencing: the drug quantity attributable to him; a drug-house enhancement; and the denial of a minor-participant reduction. We affirm as to each issue.

### 1. Miller's Drug Quantity

"We review the district court's factual determination of the quantity of drugs involved in an offense for clear error." *United States v. McReynolds*, 69 F.4th 326, 331–32 (6th Cir. 2023) (citing *United States v. Russell*, 595 F.3d 633, 646 (6th Cir. 2010)). There is no clear error if the

district court's drug approximation is "supported by 'competent evidence in the record.'" *Id.* at 332 (quoting *United States v. Mahaffey*, 53 F.3d 128, 132 (6th Cir. 1995)); *United States v. Ward*, 68 F.3d 146, 149 (6th Cir. 1995) ("An approximation by a court is not clearly erroneous if it is supported by . . . 'some minimum indicium of reliability beyond mere allegation.'" (quoting *United States v. Smith*, 887 F.2d 104, 108 (6th Cir. 1989))).

"To calculate drug-quantity, '[t]he district court can make a reasonable estimate based on physical evidence or testimony.'" *United States v. Gardner*, 32 F.4th 504, 524 (6th Cir.) (quoting *United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020)), *cert. denied sub nom. Carey v. United States*, 143 S. Ct. 251 (2022). A defendant is accountable "for drug quantities 'with which he was directly involved' or that were 'reasonably foreseeable' to him as part of a criminal conspiracy." *Id.* (quoting *United States v. Young*, 847 F.3d 328, 367 (6th Cir. 2017)). "The government has the burden of proving by a preponderance of the evidence the amount of drugs for which a defendant is accountable." *McReynolds*, 69 F.4th at 332 (quoting *Mahaffey*, 53 F.3d at 131).

At Miller's sentencing, the government sought to attribute 39.5 pounds of methamphetamine to him. The government again called Agent Hager to testify about five drug transactions involving Miller. Three transactions—totaling 4.5 pounds of methamphetamine—are not disputed: two instances of Miller delivering one pound of drugs to Fugate, and one instance of Miller receiving proceeds from Fugate for 2.5 pounds. Miller takes issue with the remaining two transactions involving thirty-five pounds in total.

According to Agent Hager, on March 30, 2021, Miller and Robertson met suppliers from California, including Wilson, at Robertson's residence. The suppliers pulled into Robertson's garage and closed the garage door. Agent Hager testified that "all individuals were inside to

include Mr. Miller," and that the drugs were unloaded from the suppliers' vehicle for about an hour. R. 493, PID 2539. Miller exited the front door carrying a green box that he eventually put into the trunk of a vehicle. *Id.*; *see also id.* at 2542 (testifying that "Miller was inside with all of them" before exiting the house with the green box). Shortly after, Miller and an unknown woman left the Robertson residence in that car and went to the Steeplechase apartment, while the California suppliers eventually left in another vehicle. Fugate then arrived and pulled into Robertson's garage, where she picked up a fifteen- to twenty-pound load of methamphetamine in a cooking pot that "appeared to be a portion of" the stockpile delivered by the California suppliers and unloaded in Robertson's garage. *Id.* at 2541, 2543; *see also* R. 345, PID 1605–06 (testimony from Fugate that although she did not witness it firsthand, she believed the drugs were from "[t]he car [that] back[ed] out earlier and hit the Monte Carlo," which, as confirmed by Agent Hager's testimony, was the California suppliers' car). Fugate did not know whether Miller himself had placed anything into the drug-filled cooking pot that Fugate picked up on March 30. Authorities confirmed Miller's and Fugate's involvement with the drug shipment by reviewing footage from a pole camera posted outside Robertson's residence, consulting GPS tracking data on the vehicle driven by Miller, listening to a recorded call that Fugate placed to an incarcerated coconspirator while Fugate was in Robertson's garage, and interviewing Fugate herself.

The second transaction that Miller disputes occurred on April 18–19, 2021, and followed activity similar to that on March 30. Miller and Robertson again met California suppliers, including Wilson, at Robertson's residence; Robertson's garage was cleared of other vehicles; and the California suppliers pulled one of their vehicles into the garage and the garage door was closed. During this time, an unknown man arrived with an empty satchel; he eventually left the Robertson residence with the satchel full. Robertson, Miller, and the California suppliers then left in their

respective vehicles. Fugate arrived about one hour later, and Robertson, Miller, and the California suppliers returned to meet her. Fugate left the Robertson residence with a large cooking pot that she told investigators contained about twenty pounds of methamphetamine. (Agent Hager clarified that although Fugate would later provide inconsistent information about whether the cooking pot contained ten, fifteen, or twenty pounds of methamphetamine, her initial report to investigators was "confident" that it was twenty pounds, and she again reiterated that it was twenty pounds in preparation for the second trial.) Fugate did not state that Miller handed her the cooking pot, but she did tell authorities that he was present in the garage. Finally, Agent Hager testified that Miller both received deposits and proceeds, likely from methamphetamine distribution, and made deposits into Wilson's account, likely for the purchase of drugs from California, all around February 2021 through March 2021.

Miller argues that "[a]lthough Fugate's testimony connected Miller to 4.5 pounds of meth," Miller was not present for Fugate's pickup of fifteen to twenty pounds of methamphetamine on March 30, 2021, and although Miller was in the Robertson residence when Fugate picked up twenty pounds of methamphetamine on April 18–19, 2021, no testimony indicated that Miller was aware of what was in the cooking pot that Fugate used for the pickup. Miller Br. 17–18. Miller also argues that the distribution of such large quantities was inconsistent with his own participation in drug distribution, and therefore the cooking-pot deliveries were not foreseeable to him. The district court did not agree, citing Miller's role as Robertson's right hand. The district court further cited Miller's presence at the unloading of the California suppliers' vehicle, as well as the sums of money deposited into Miller's account and the money he deposited in others' accounts, as evidence that large-scale distribution was foreseeable to Miller.

Because these determinations are supported by competent evidence in the record, the district court did not clearly err. Miller's presence at the March and April 2021 deliveries and his handling of at least a portion of the conspiracy's proceeds and payments suggests, at least by a preponderance of the evidence, that he was aware of the scale of the methamphetamine distribution. Fugate and others visited the Robertson residence to pick up their allotments while Miller was there, similarly rendering it foreseeable to Miller that the California deliveries were indeed being distributed. Agent Hager explained the various means that investigators used to verify the information presented to the district court. We have no basis to conclude that attributing 39.5 pounds of methamphetamine to Miller was clear error.

### 2. Miller's Drug-House Enhancement

"[W]e review the district court's interpretation of the Guidelines de novo, and its factual findings for clear error." *United States v. Taylor*, 85 F.4th 386, 388 (6th Cir. 2023). When we review the application of the guidelines to the facts, however, "[w]e have . . . not spoken with a uniform voice." *Id.* (citing *United States v. Bell*, 766 F.3d 634, 636 (6th Cir. 2014)); *see also United States v. Tripplet*, 112 F.4th 428, 434–35 (6th Cir. 2024) (Murphy, J., concurring in part and concurring in the judgment) (raising the issue of mixed questions and calling for a determination of whether a given mixed question "comes with more of a legal than a factual hue"). But because Miller's arguments fail even under de novo review, and he argues only that the district court "clearly erred" in applying the drug-house enhancement, Miller Br. 18, we need not resolve this debate now, *see Taylor*, 85 F.4th at 388.

"[T]he drug-house enhancement applies to anyone who (1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013); *see also* U.S. Sent'g Guidelines

Manual § 2D1.1(b)(12) (2021). The district court determined that Miller maintained the Steeplechase apartment as a drug house.[8] Only the second element is at issue here: Miller argues that he lacked sufficient control of the Steeplechase apartment to justify the enhancement. *See* U.S. Sent'g Guidelines Manual § 2D1.1 cmt. n.17 (2021) ("Among the factors the court should consider in determining whether the defendant 'maintained' the premises are (A) whether the defendant held a possessory interest in (*e.g.*, owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.").

"If a defendant does not have a legal interest in the premises, the enhancement may still apply if the government makes a sufficient showing of de facto control." *United States v. Hernandez*, 721 F. App'x 479, 484 (6th Cir. 2018) (first citing *United States v. Russell*, 595 F.3d 633, 644 (6th Cir. 2010); and then citing *United States v. Tippins*, 630 F. App'x 501, 504 (6th Cir. 2015)). The "long list of things that can provide evidence of maintenance . . . include 'control, duration, acquisition of the site, renting or furnishing the site, supervising, protecting, supplying food to those at the site, and [maintaining] continuity.'" *Id.* (emphasis omitted) (quoting *Russell*, 595 F.3d at 644). Finally, "[a]lthough a person need not be present at the location constantly for the enhancement to apply, the word *maintains* 'contemplates a defendant who is more than a casual visitor.'" *Id.* (quoting *United States v. Flores-Olague*, 717 F.3d 526, 532 (7th Cir. 2013)).

---

[8] At the apartment, Miller provided meth to Fugate on at least one occasion and received proceeds from her on at least one other. According to Agent Hager, investigators also found baggies and wrapping in the apartment's trash consistent with the enterprise's practice of packaging drugs in that manner. Agent Hager also testified that Fugate told authorities that her coconspirators used the Steeplechase apartment to break down drugs and cut it for redistribution. And, after searching the apartment, investigators found a wall safe containing drug residue, baggies, scales, and a firearm.

Robertson paid for the Steeplechase apartment, and Fugate executed the lease in her name. Fugate understood that the apartment would be used as a stash house. However, neither Robertson nor Fugate lived there; only Miller lived there "consistently"—including by parking his car there and staying overnight—at least between late February 2021 and early May 2021. R. 493, PID 2555, 2565. Although a surveillance camera captured others occasionally staying at the residence "for a couple of nights," only Miller "resided" there. *Id.* at 2555–56. Further, while Miller was living there, Fugate "was not given a key or door code or any access, unless permitted by Mr. Miller." *Id.* at 2557.

Miller argues that the district court incorrectly focused on the amount of time Miller spent at the apartment, not the extent of his control over the residence. First, the district court discussed Miller's length of stay *in response to* Miller's argument at sentencing that he was only at the Steeplechase apartment for a small portion of the overall conspiracy. *See* R. 493, PID 2580–81, 2588. Second, and in any event, the factor of control clearly does not favor Miller because he was the only person to live there consistently, including by parking there and staying overnight. *Cf. Russell*, 595 F.3d at 645 (noting that vehicles belonging to the defendant were registered to or parked at the drug house as relevant evidence that the defendant maintained the premises). Miller conducted drug trafficking business for the duration of his time there, and he regulated Fugate's access to the residence while he resided there. He therefore exhibited the "control, duration, . . . supervising, protecting, . . . and [maintaining] continuity" that distinguishes him from a "casual visitor" and that, instead, supports applying the drug-house enhancement even under a de novo standard of review. *Hernandez*, 721 F. App'x at 484 (internal quotation marks omitted).

### 3. Miller as a Minor Participant

We "review 'a district court's decision concerning a defendant's role in an offense' for clear error." *McReynolds*, 69 F.4th at 332 (quoting *United States v. Gates*, 461 F.3d 703, 709 (6th Cir. 2006)); *see also United States v. Miller*, 56 F.3d 719, 720 (6th Cir. 1995) (applying clear-error review to request for minor-participant reduction). Miller "has the burden of proving mitigating factors justifying a reduction for being a minor participant by a preponderance of the evidence." *Miller*, 56 F.3d at 720 (citing *United States v. White*, 985 F.2d 271, 274 (6th Cir. 1993)).

Miller must establish that he was "'substantially less culpable than the average participant' in the criminal enterprise." *Id.* (quoting *United States v. Smith*, 918 F.2d 664, 669 (6th Cir. 1990)). We consider the "totality of the circumstances," including "the degree to which the defendant understood the scope and structure of the criminal activity"; "the degree to which the defendant participated in planning or organizing the criminal activity"; "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority"; "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts"; and "the degree to which the defendant stood to benefit from the criminal activity." U.S. Sent'g Guidelines Manual § 3B1.2 cmt. n.3(C) (2021).

The district court did not clearly err in deciding that these factors supported denying Miller's request for a minor-participant reduction. Miller and Robertson were seen together "[i]f not every day, very consistently every other day." R. 493, PID 2551. The record supports the conclusion that Miller occupied a position of trust and importance to Robertson, the enterprise's leader, distinct from that of a foot soldier or other similar minor participant. Miller and Robertson went to the bank together; Miller was trusted to make payments to the California suppliers; he was

present when significant shipments from the California suppliers arrived and were unloaded; he occasionally provided drugs to and collected proceeds from Fugate, the organization's chief distributor; and, as we found above, he resided in and maintained control over a stash house for the benefit of the drug-distribution operation.

Miller again attempts to limit his participation to only three drug transactions—corresponding to the 4.5 pounds of methamphetamine discussed in the drug-quantity section above—an argument we have already rejected. The district court did not clearly err when it found that this underestimated Miller's position in the criminal enterprise. Nor does Miller's lieutenant position make him a "follower" deserving of minor-participant status. Whether Miller "exercise[d] any decision-making authority" is but one factor of many provided by the sentencing guidelines. *See United States v. Nelson*, No. 20-2083, 2022 WL 620152, at \*3 (6th Cir. Mar. 3, 2022) (affirming denial of minor-participant reduction where, even though the defendant may have lacked decision-making authority, she nonetheless accompanied the ringleader on trips, contributed resources to the trips, and distributed drugs obtained on the trips). The record more than supported a conclusion that notwithstanding an apparent lack of executive-planning authority, Miller nonetheless significantly "understood the scope and structure of the criminal activity" and participated in and was responsible for key portions of the conspiracy's operations. *See* U.S. Sent'g Guidelines Manual § 3B1.2 cmt. n.3(C) (2021).[9]

---

[9] Miller also asks us to compare the drug quantity attributable to him—17.9172 kilograms—with the seemingly far greater quantities attributed to coconspirators like Fugate (10,829.8905 kilograms) and Robertson (507,579.39 kilograms). *See* R. 457, PID 2117, 2123. As the government points out, however, the Fugate and Robertson figures are *converted* drug weights. When we appropriately convert Miller's quantity to 35,834 kilograms, it becomes apparent that the quantity attributable to him is second only to Robertson, the leader of the operation. This comparison therefore does not suggest that Miller was "substantially less culpable than the average participant." *Miller*, 56 F.3d at 720 (internal quotation marks omitted).

Accordingly, we find no error in the denial of the minor-participant reduction.

### C. Robertson's Consecutive Terms

When a defendant attacks a consecutive sentence on the basis that the district court failed to justify its decision, we typically review for abuse of discretion. *United States v. King*, 914 F.3d 1021, 1024 (6th Cir. 2019). If the defendant failed to object at the sentencing hearing, however, we review for plain error. *Id.* Robertson concedes that he failed to object and, therefore, plain-error review applies. Plain error is a "demanding standard" and consists of "an error that is 'so plain that the trial judge was derelict in countenancing it.'" *King*, 914 F.3d at 1024 (quoting *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc)).

District courts have the discretion to impose terms of imprisonment concurrently or consecutively and must, in exercising that discretion, consider the factors set forth in 18 U.S.C. § 3553(a). 18 U.S.C. § 3584(a), (b). Section 3553(a)(4) and (5), in turn, require a district court to consider the sentencing guidelines and pertinent policy statements—here, those found in U.S. Sent'g Guidelines Manual § 5G1.3(d) & cmt. n.4(A) (2021). "The sentencing court has an obligation to 'adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.'" *United States v. Morris*, 71 F.4th 475, 482 (6th Cir. 2023) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)). District courts need not, however, "conduct a separate Section 3553(a) analysis for the concurrent or consecutive nature of the sentence," *United States v. Berry*, 565 F.3d 332, 343 (6th Cir. 2009), nor must they "state a 'specific reason' for a consecutive sentence," *United States v. Johnson*, 640 F.3d 195, 209 (6th Cir. 2011). As long as the district court "makes *generally clear* the rationale under which it has imposed the consecutive sentence," that decision will survive even abuse-of-discretion review. *Johnson*, 640 F.3d at 209 (quoting *United States v. Owens*, 159 F.3d 221, 230 (6th Cir. 1998)).

Here, the district court questioned a witness about Robertson's Indiana criminal case; heard argument from the government about Robertson's criminal history, which included discussion of that case; and thoroughly reviewed the section 3553(a) factors. The district court did not expressly tie these considerations to the imposition of a consecutive sentence, nor did it or any party discuss section 5G1.3(d) of the sentencing guidelines. The district court did, however, "look at the seriousness of this case, . . . look at these factors of 3553, [and] look at issues of deterrence" before imposing a sentence that "will run consecutive to any additional penalty that may be imposed in the case from Indiana." R. 505, PID 2850–51; *see also id.* at 2853–54 (stating that "the following sentence is sufficient but . . . not greater than necessary to comply with the purposes of Title 18, Section 3553(a)").

We confronted similar circumstances in *United States v. Ward*, 436 F. App'x 601 (6th Cir. 2011). There, the parties applied the wrong subsection of section 5G1.3, and the district court did not tie its consideration of the section 3553(a) factors to its decision to impose a consecutive sentence. We affirmed nonetheless, because "on plain error review, so long as the district court clearly stated that the sentence was imposed pursuant to the § 3553(a) factors, we will not require it to say more." *Ward*, 436 F. App'x at 605 (citing *United States v. Harmon*, 607 F.3d 233, 239 (6th Cir. 2010)). As set forth above, the district court here likewise clearly imposed Robertson's sentence pursuant to and immediately following its consideration of the section 3553(a) factors. *See Morris*, 71 F.4th at 483 ("[A] district court does not abuse its discretion where it imposes a consecutive sentence 'in conjunction with or immediately following the court's invocation of the § 3553(a) factors . . . .'" (quoting *United States v. Kitchen*, 428 F. App'x 593, 597 (6th Cir. 2011))). This case is a far cry from *Morris*, a case that Robertson cites for support, where upon resentencing the defendant, "[t]he only explanation clear from the record [wa]s that the district court wanted to

impose the same sentence it had previously imposed, despite the significant reduction in the advisory Guidelines range." *Id.* Accordingly, the district court did not commit plain error by imposing a consecutive sentence here.

**D. Robertson's Claim of Constructive Denial of the Assistance of Counsel at Sentencing**

Robertson also challenges the adequacy of his representation at sentencing. In Robertson's view, his attorney spoke infrequently and addressed inconsequential matters. In particular, Robertson faults counsel for failing to sufficiently argue for reductions to Robertson's guidelines range; for inadequately crossing Morgan, the government's first witness; for declining to cross the government's second witness, Agent Hager, or call any witnesses on Robertson's behalf; and for failing to discuss the mitigating factors set forth in 18 U.S.C. § 3553. At the sentencing hearing, Robertson "object[ed] to ineffective assistance of counsel" because the two did not "see eye to eye" and "there's been things that [Robertson] . . . whispered . . . to her" that "she didn't repeat." R. 505, PID 2859. The district court determined that it was not "necessary for the Court to address those objections," because "[w]ith regard to any claim of ineffective assistance of counsel, those challenges are usually made following any direct appeal." *Id.*

Robertson frames his claim as one for constructive denial of the assistance of counsel, which "occurs where 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing,' or another 'constitutional error of the first magnitude' violating the right to counsel is shown." *United States v. Detloff*, 794 F.3d 588, 593 (6th Cir. 2015) (quoting *Moss v. Hofbauer*, 286 F.3d 851, 860 (6th Cir. 2002)); *see also Phillips v. White*, 851 F.3d 567, 580 (6th Cir. 2017) (constructive denial occurs "when counsel's performance is so defective that he may as well have been absent"). "Constructive denial of counsel constitutes structural error requiring no further showing of prejudice." *Detloff*, 794 F.3d at 594; *see also United States v. Cronic*, 466 U.S.

648, 658 (1984) ("There are . . . circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified").[10]  We have consistently held, however, that we "will not review a claim of ineffective assistance on direct appeal except in rare cases where the error is apparent from the existing record."  *United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006) (citing *United States v. Gardner*, 417 F.3d 541, 545 (6th Cir. 2005)); *see also Detloff*, 794 F.3d at 595 (applying this reluctance to claims of constructive denial).

This is not a case in which the parties had the opportunity to develop a record regarding this claim, and the district court never ruled on it.  *Cf. United States v. Hynes*, 467 F.3d 951, 969–70 (6th Cir. 2006) (taking up claim "in the interest of judicial economy" because "the district court ruled on the claim as part of [the defendant's] motion for a new trial, both parties agree that the record is sufficiently developed to permit review, and the claim is easily resolved").  We do not know why Robertson's counsel conducted a narrow cross-examination of Morgan and declined to cross-examine the government's second witness, why his counsel emphasized certain factors in her statement preceding Robertson's allocution, or whether there were any witnesses or evidence that counsel should have brought to the district court's attention.  *See Lopez-Medina*, 461 F.3d at 737 (deferring consideration of claim where "[t]he record contains no evidence regarding why, for example, defense counsel chose not to file any additional motions beyond his initial motion to suppress or why he chose not to challenge the agents as experts on matters pertaining to narcotics trade").

---

[10] For presumed prejudice under *Cronic* to apply, the constructive denial must occur "during a critical stage of trial."  *Phillips*, 851 F.3d at 580.  Sentencing is a critical stage.  *Id.* (gathering cases).

We also note that "we have applied *Cronic*" and its presumption of prejudice "only where the constructive denial of counsel and the associated collapse of the adversarial system is imminently clear." *Moss*, 286 F.3d at 861. In addition, "the deprivation of counsel must persist throughout the given stage," otherwise we must instead review under *Strickland v. Washington*, 466 U.S. 668 (1984), not *Cronic*. *Phillips*, 851 F.3d at 580 (citing *Bell v. Cone*, 535 U.S. 685 (2002)). To the extent that analysis under *Strickland* may be more appropriate than under *Cronic*, the fact that the parties have not offered any alternative arguments under that framework provides yet another reason to defer consideration of this claim to any future motion pursuant to 28 U.S.C. § 2255.

We therefore decline to consider this portion of Robertson's appeal at this time.

### III.    Conclusion

For the above reasons, we AFFIRM the district court in all respects.